[No. S004766. Crim. No. 26406. Oct. 24, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT HENRY NICOLAUS, Defendant and Appellant.

554

560

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Dee Hayashi and Nancy Gayno, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Ronald S. Matthias and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Defendant Robert Henry Nicolaus appeals from a judgment of death imposed under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.)[1] He was convicted of the first degree murder of his ex-wife, Charlyce Robinson. (§ 187.) A firearm-use enhancement was found true. (§ 12022.5.) The murder was committed in Sacramento County; defendant successfully moved for a change of venue and the case was ordered transferred to Santa Clara County for trial.

Upon his conviction, defendant admitted the truth of the three alleged prior-murder special circumstances, having been previously convicted of the murders of his three children in 1964. (§ 190.2, subd. (a)(2).) The jury fixed the penalty at death; this appeal is automatic. (§ 1239, subd. (b).)

For the reasons set forth hereafter, we conclude that the judgment should be affirmed in its entirety.

## I. FACTS

### A. GUILT PHASE

*The Murder*

At 4 p.m. on February 22, 1985, Ron Landrith and his father Leon were in a lot adjacent to their residence on Eleanor Street in Sacramento. A turquoise Rambler parked in the alleyway next to their property suddenly pulled into an adjoining lot and came to a stop in front of, and blocking, a red Volkswagen. Defendant got out, walked over to the Volkswagen, and began screaming at a woman seated therein, stating words to the effect of, "How could you do this to me?" He reached into the Volkswagen and started beating the woman, then retrieved a handgun from the Rambler and shot her in the chest. Ron ran inside to call the police. Leon observed defendant walk back to his car, stand there several seconds, then return to the Volkswagen and shoot the victim, who had exited or fallen from the car to the ground, a second time at point-blank range.

As defendant drove off, the Volkswagen rolled across the alley and came to a stop against a pole. A young child was in the backseat. Moments later defendant drove back into the alley, pulled up alongside the victim who was lying on the ground, looked at her for several seconds, then drove off again.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

The Landriths furnished defendant's license plate number to police who arrived on the scene within minutes. Officer Scott testified that the victim was found lying on her back in the parking lot, her face covered with blood and a gunshot wound to her chest, crying, "Oh my God, my baby, where's my baby?" The victim was later identified as defendant's ex-wife Charlyce (Lisa) Robinson. When asked who shot her, Lisa replied, "Robert Nicolaus." She repeated defendant's name, spelled it, and stated he lived on Erickson Street, apartment 1. The officers took custody of Lisa's three-year-old son who was in a hysterical state. Defendant's address was obtained through a Department of Motor Vehicles (DMV) check; officers arrived at his apartment less than 20 minutes after the shooting but did not find him there.

The victim died en route to the hospital. An autopsy performed the following day revealed extensive facial injuries consistent with her having been beaten with fists. She had been shot twice; once through the lower chest, and once through the buttock. Both bullets were retrieved. The cause of death was hemorrhage from a severed aorta caused by the gunshot wound to her lower chest. Ballistics tests established that the fatal gunshot had been fired from a distance of four to eight inches.

The next day, police located defendant's Rambler in a public parking lot. A .25-caliber semiautomatic handgun was observed in plain view on the front floorboard and seized, and the car was impounded. A second handgun in a bag was later recovered from the vehicle during the execution of a search warrant. Ballistics tests established that the .25-caliber handgun was the murder weapon.

*Events Leading up to the Murder*

The subsequent investigation revealed defendant's bitter and long-standing grudge against his ex-wife.

Wilber "Deke" Bennett had known defendant since 1955. Defendant had repeatedly told Bennett that Lisa had stolen money from him. Defendant was angry and bitter about this, and would get upset when he talked about Lisa. Prior to the murder he sought Bennett's assistance in locating Lisa. Bennett denied defendant told him he wanted to kidnap, torture, or kill Lisa, or that he (Bennett) had told his girlfriend, Jillette Kruhalski, that defendant wanted to kidnap Lisa.

Kruhalski testified that, one year prior to the murder, defendant had asked her to befriend Lisa. At defendant's request, Kruhalski went to speak with Lisa at a store where Lisa worked; on another occasion she and defendant

waited for Lisa to leave work and then followed her. Sometime thereafter, Bennett told Kruhalski that Lisa had stolen money from defendant, and that defendant was going to get even with her. Contrary to Bennett's testimony, Kruhalski recalled that six months before Lisa was killed, Bennett informed her that defendant was going to kidnap Lisa.

Bennett's sister, Orra Thompson, testified that sometime in 1984 defendant told her Lisa and her mother had taken $5,000 from his savings account, which money was supposedly earmarked for funeral arrangements for defendant's children, and had spent it on themselves instead. Defendant also asked Thompson if she would like to "work" for him, offering her $1,000 plus expenses to "get to know" Lisa. Thompson was to obtain information for him on Lisa's daily activities and also find out what she could about the validity of defendant and Lisa's Mexican divorce. Defendant told Thompson he stood to inherit some money when his mother died and did not want Lisa to get any of it. Thompson never actually met Lisa. On two occasions defendant paid her $7 and $25 respectively for her attempts to contact Lisa. Although defendant never expressed a desire to harm his ex-wife, Thompson perceived that he harbored bad feelings about her, and that she would not cooperate with him.

"Deke" Bennett's brother Harry knew defendant and had introduced him to one Dick Winn in the spring of 1984. Winn testified that Harry Bennett and defendant asked him to obtain a couple of pistols for them. Winn was told "throwaways" would be fine. Defendant agreed to pay for the guns, and $150 was discussed as the purchase price. Winn understood that the guns were to be used in retaliation for a long-standing grudge which defendant bore against his former wife. Defendant claimed she had run off with his "defense money." When Winn suggested defendant consider whether he could get away with the plan, defendant replied that there would be no doubt about who did it, and that he did not care. Defendant and Bennett also wanted Winn to "grab" Lisa and take her someplace "where noise wouldn't make no difference" so that defendant could "spend some time with her." They offered Winn $2,000 to do the "grabbing," and he agreed. Winn specifically asked defendant whether he planned to kill Lisa, which defendant denied. When asked why he wanted to "grab" his ex-wife, defendant replied that "it wasn't for any picnic." Winn was unsuccessful in locating any handguns and ultimately lost interest in the plan.

Lisa had a 15-year-old daughter, Donna Johnson, who was residing with her in 1985. Donna testified that before her death her mother was involved in a religious organization called "The Saints." She recalled frequently seeing defendant at the grocery store, and in front of the apartment where they lived, during the months prior to her mother's death. Two weeks before the

murder, defendant confronted Donna and Lisa in a laundromat and "stared" at them for a prolonged period. About that same time defendant appeared at a Saints' meeting, pounded on the door, and demanded to speak with Lisa, who refused to see him.

Donna testified she was acquainted with Pasquale D'Antonoli, who was an alcoholic. Shortly before the murder he had come to their apartment and told Lisa he needed to move from his apartment within a week. He returned on the afternoon of her mother's murder; Lisa was not home at that time.

D'Antonoli testified he had known defendant since 1954 and had met defendant's ex-wife Lisa while they were married. Three or four days prior to the murder, defendant sought his assistance in "contacting" Lisa. D'Antonoli agreed to offer Lisa some money to help him "move from his apartment." Defendant told D'Antonoli he could not contact Lisa himself because they were not too friendly, and that he wanted to discuss the legality of their Mexican divorce. D'Antonoli testified that defendant's desire and intent to harm his ex-wife "showed." Defendant promised D'Antonoli vodka and money in exchange for his assistance.

During the days prior to the murder defendant drove D'Antonoli to Lisa's apartment three times. On the first occasion she was not home; defendant gave D'Antonoli a bottle of whiskey for his efforts. On the second occasion D'Antonoli contacted Lisa and she agreed to help him move; defendant gave D'Antonoli some liquor and "a few bucks" for these accomplishments. According to plan, D'Antonoli was to meet Lisa at a Lucky's market and have her drive him to the alley off Eleanor Street. Defendant and D'Antonoli visited the location. The night before the murder D'Antonoli stayed at defendant's apartment, got drunk, and went over the plan.

On the afternoon of the murder D'Antonoli and defendant drove to the vicinity of Lucky's and parked. Defendant began jogging. D'Antonoli met Lisa according to plan and got in her car. While they were driving, Lisa saw defendant jogging and pointed him out to D'Antonoli, who revealed nothing of the plan. When they reached the alley, D'Antonoli noticed defendant's car parked nearby. Once in the alley, D'Antonoli told Lisa he would be right back and walked off. He passed defendant, who was alone in his car with the motor running. Defendant asked, "Is she in the car over there?" D'Antonoli replied, "Yes, I'll see you later." D'Antonoli testified that Lisa's little boy was in her car at the time. D'Antonoli left the scene to buy liquor with the $30 defendant had given him.

*Events Subsequent to the Murder*

On the day following the murder, Sacramento police officers executed a search warrant at defendant's apartment. Defendant had not returned to the apartment. During the search a manila folder was seized from atop a desk in the living room. Numerous handwritten documents were inside the folder; expert testimony established they had been written by defendant. The bulk of the documents contained notations of defendant's feelings about Lisa and various schemes for revenge. They outlined plans to get the victim to various locations, and items that defendant would have to procure in order to carry out his intentions of kidnapping or harming her. Several of the plans tracked the testimony of D'Antonoli, Bennett, Winn, Thompson, and Kruhalski concerning the events leading up to Lisa's murder. One writing described plans for D'Antonoli to direct Lisa to a chosen spot, ostensibly to help him move, with references to an alternate plan if she balked. There was a reference to D'Antonoli removing her blindfold and gag. Other documents contained notations about how Lisa's confidence might be gained. Another, entitled "Contract," made reference to a $1,000 contract with "Orra" for the befriending of Lisa. Yet another appeared to be a packing list, and included items such as acid, an ax, a sleeping bag, rope, tape, and things to "get from car." Another document, entitled "Disposal," made reference to various Sacramento bars and contained the notations "dumpster," "hospital," and "church."

Several documents evidenced defendant's scorn and hatred of religion, in particular the sect of Christianity to which his ex-wife belonged. Others revealed his apparent intense hatred of Lisa, her mother Ione, a couple surnamed the "Nieces," and the wrongs he believed they had all committed against him. He referred to Lisa and her mother as the "Satanic Sisterhood," "evil incarnate," and the "two main ultimate causes of my children's demise." Lisa was characterized in one document as the "accursed whore . . . who destroyed all possible chances for a good life for my children and myself," and as "the archdemon of destruction" in a document dated January 1, 1985 (less than two months prior to the murder), which read:

"It is my single resolve to avenge my children's destruction before I enter my 52nd year, so that I may slip away from this world at peace with myself. Woe to the archdemon who destroyed us almost 21 years ago. [¶] Before I entered my 32nd year, my children were destroyed. Before I enter my 52nd year, the archdemon who destroyed my children will be brought to book, so I swear. The archdemon of destruction will itself suffer destruction. I swear this. Some people, the fortunate, die quickly. Other people, the unfortunate,

die slowly. I am one of the unfortunates." (Defendant turned 52 years old exactly 6 days before killing his ex-wife.)

"Deke" Bennett testified he learned about Lisa's death from news reports. He received a collect call from defendant on the day following her murder. Defendant asked Bennett whom he had hurt; Bennett replied that as far as he knew, only Lisa, who had died. Defendant said nothing to indicate any surprise at hearing this news. When Bennett asked defendant where he was, defendant replied, "I'm buried." Although contacted by a Sacramento detective the following day, Bennett did not reveal that he had spoken with defendant at that time.

Bennett received another collect call from defendant 10 days after the murder. Defendant wanted to know who had been questioned or arrested for the crime. This time Bennett informed police defendant had called. Bennett's telephone bill reflected that the call had been placed from New York City.

Defendant was arrested by FBI agents in York, Pennsylvania on July 20, 1985. At first he claimed his name was Pasco D'Antonoli. After admitting his true name and waiving his *Miranda* rights, defendant asserted he had no knowledge of the murder of his ex-wife. He claimed he left Sacramento a day or two before the date of the murder and traveled to New York City, Washington, D.C., and Virginia. He admitted feeling the victim owed him $5,000, but claimed he did not know where she lived and had not spoken to her since sometime in 1984. He denied knowing he was wanted for murder and maintained he had not touched a handgun since 1964. When confronted with the fact that Lisa had named him as her murderer in her dying declaration, he suggested she was confused or lying and that he was being "framed."

### Defense

At the close of the People's case-in-chief, the defense rested without presenting any evidence. The thrust of defense counsel's argument to the jury was that defendant was guilty, at most, of second degree murder. Counsel emphasized passages from the documents seized from defendant's apartment which, it was argued, indicated his desire to harm, but not kill, his ex-wife. Counsel argued it was a mere fortuity that the first bullet had severed the victim's aorta and proved fatal, urging that if defendant had intended to kill Lisa, he would have finished her off with the second shot instead of shooting her in the buttock.

## B. Special Circumstances

Defendant was convicted of the first degree murders of his three children in 1964, and was sentenced to death. In 1967, this court modified the judgment by reducing the crimes to murder of the second degree and, as so modified, affirmed the judgment. (*People* v. *Nicolaus* (1967) 65 Cal.2d 866, 883-884 [56 Cal.Rptr. 635, 423 P.2d 787] [maj. opn. by Burke, J.; dis. opn. by Mosk, J.].) Defendant served a prison term until his release on parole in 1977.

These three convictions formed the basis of the prior-murder special circumstances alleged herein. (§ 190.2, subd. (a)(2).) According to a pretrial agreement, the jury was never informed at the guilt phase of the fact that defendant had been convicted of the murders of his three children. After the jury returned its verdict finding defendant guilty of first degree murder, defendant elected, for tactical reasons, to admit the truth of the prior-murder special-circumstance allegations (so that the jury would not learn he had initially been sentenced to death for those murders), and the trial proceeded to the penalty phase.

## C. Penalty Phase

*Prosecution Case*

The prosecution's penalty phase case consisted of the brief testimony of two witnesses to establish the essential facts underlying defendant's convictions of the murders of his children. Roberta, age seven, and Donald, age five, were the children of defendant and his former common law wife, Jeannie Lara. Heidi, age two, was the child of defendant and Lisa.

Alejo Lara, Jeannie Lara's husband at the time, testified that defendant would regularly pick up Donald and Roberta to visit with them. On May 23, 1964, he picked them up to have their portraits done. On the following day Lara received a phone call from Lisa, defendant's wife at the time. She indicated defendant had locked his three children in the trunk of his car, which was parked in Sacramento. Lara went out in search of his two stepchildren and found defendant's car about the same time police located it. The three children were found shot to death in the trunk. Two-year-old Heidi had four bullet wounds to her head; seven-year-old Roberta and five-year-old Donald each had three gunshot wounds to their heads. All the shots had been fired at point-blank range.

*Defense Case*

Defendant presented evidence regarding the circumstances leading up to his murder of his three children and, twenty years later, his ex-wife. Various

witnesses testified about his upbringing and psychological profile; defendant himself took the stand but limited his testimony to facts surrounding Lisa's murder.

Defendant's mother was a strict Catholic. He attempted to conform to her standards; until age 20 he did not smoke, drink, or date women. In his teenage years he began to harbor doubts about religion, which created a conflict at home. Defendant was characterized throughout his college years as quiet, shy, somewhat naive and studious. One friend characterized him as "brilliant," and a defense psychiatrist testified he had a relatively high IQ.

In 1953, at age 20, defendant joined the Air Force. While in the service he began to smoke, drink heavily, and visit prostitutes. He studied Marxism and became an atheist. On one occasion he got drunk and "passive oral copulation" was performed on him by another man. As a result of this incident, defendant was discharged from the armed services.

In 1956, defendant began cohabiting with Jeannie Lara. Although they never married, two children, Donald and Roberta, were born of the relationship. Defendant characterized Lara as promiscuous and as having low moral and social standards.

In 1960, defendant sought to gain custody of Donald and Roberta. An attorney advised him he would have to establish a home and family life to demonstrate he could provide for the children. Shortly thereafter he married Lisa, who was 15 years old at the time. He married Lisa because she was pregnant, because he wanted to get her away from her mother Ione, and to further his objective of establishing a family to gain custody of the children.

After the birth of their daughter Heidi, defendant was determined that they live decent lives. He quit drinking, began living very frugally, and fed the family spaghetti and beans in order to save all his money. He felt Lisa's mother Ione was promiscuous and would be a bad influence on the children, so he prohibited Lisa from seeing her.

On May 22, 1964, Lisa told defendant she was leaving him. He became despondent, not wanting Lisa and Heidi to move in with Ione, and viewing the circumstances as destroying his hope of establishing a stable family life by which to gain custody of his other two children. On the following day he took all three of his children, ostensibly to have their photographs taken. He bought them toys and candy to make them happy, took them for a ride, placed them in the trunk of his car and fatally shot each child in the order of their birth. Defendant told a court-appointed psychiatrist at the time of his

trial for the murders that he had come to believe the children would be better off dead, and that his deeds were the "final fatherly act" he could do for them.

Evidence was also presented regarding defendant's service of his 13-year prison term for the 3 murders. He was interested in behavioral psychology, and had a job scoring fellow inmates' psychological tests while incarcerated. He also corresponded with his former psychology professor at Sacramento State University. Defendant was released in 1977 and remained violation free while on parole. He worked as a warehouseman, custodian, and gardener; his employers testified that he was a hard worker. He kept up his contacts with his Sacramento State psychology professor and was introduced to another psychology professor whose class defendant audited. He was particularly interested in "operant conditioning," and submitted two articles to a behavioral psychology association that were ultimately published. Several people testified to defendant's good character since boyhood; a neighbor testified she had observed defendant with his children and never heard him utter a cross word on those occasions.

Defendant testified about the circumstances culminating in his shooting of Lisa. He identified what he believed were the "three unfinished items of business" at the time of his release from prison: his strong desire to reunite his three children in a common grave, his belief that he might come into an inheritance and the concern that Lisa could lay claim to it if their Mexican divorce was invalid, and his obsession with Lisa's prior misuse or diversion of his money.

Once paroled, defendant contacted Lisa in 1978 to obtain her written consent to his plan for the children's joint burial. She never followed through or took any action. "The idea floated through [his] mind" to harm her in some way at that time, but defendant testified, "I had no money, I had no car. I was totally without resources. Any chance of getting away, quite frankly, would have been extremely unlikely. And so I let the matter drop. . . . I thought, well, I'll wait and see what develops."

Defendant then lost contact with Lisa, other than a few chance encounters in 1981 through 1983. On March 20, 1984, he visited his daughter Heidi's grave. It was "a very terrible emotional experience" for him, and he began contemplating a plan to harm his ex-wife. He testified he thought at that time, "Well, I've got some money now. I want to leave Sacramento anyway. I can't go anywhere except downhill. I think I'll settle this old account and leave." He began writing the documents later seized upon his arrest, kept them together in a folder on his desk, and continued writing them up to

within a few days of the killing (February 22, 1985). He testified he wrote things down so he would not forget them or become too forgiving.

Defendant admitted enlisting the assistance of Jillette Kruhalski and Orra Thompson in 1984 to help him reestablish contact with Lisa. On August 21, 1984, he observed Lisa driving a van for a local church group. He characterized this encounter in his writings as "the first sighting," and began what he deemed was his final "six-month effort" to do her harm.

Defendant admitted listing "acid" as an item to bring along for his final confrontation with Lisa. He claimed he was only planning to use it to "scare her," and admitted he had a bottle of battery acid in his trunk on the day of the killing. He explained that, according to one of his plans, "the sleeping bag was to cover her up with so that she wouldn't be seen in the course of being transported." When asked what he meant by his notation, "Dispose at Nugget, Larry's, Nite Hawk, Honey Bucket, Busy Bee, Sigot, North Highlands," defendant testified, "Apparently what I was thinking of then, I wanted to make sure I would drop her off at a place where she would quickly be discovered so she—so that she could be rushed to the hospital."

Defendant denied any intent to kill Lisa. He only wanted to "punish" her psychologically and physically, to inflict pain and cause her unhappiness, by putting her in the hospital for two or three weeks. He knew he might face a prison sentence for his actions, but carried through with his plan out of extreme bitterness toward Lisa for having unforgivably enriched herself at the expense of his children. He still blamed her for the children's deaths. He planned to drop Lisa off at a hospital after harming her to ensure she would get proper care and survive. He knew he would have to leave town since she would call the police. After shooting her, "something went wrong" and help did not arrive. He returned to the scene to make sure her child was safe. The following day, when he called Deke Bennett, defendant first learned Lisa had died of her gunshot wounds. Defendant could not figure out how she had died.

## II. Jury Selection Issues

A. *Denial Of Jury Selected From Representative Cross-section of Community.*

■ Defendant contends that the trial court's denial of his motion for payment of juror fees in excess of the statutory daily fee authorized by section 1143 denied him the right to a jury selected from a representative cross-section of the community as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 16 of the California

Constitution. Counsel argued below: "We're directing the motion at those people who are excluded by reason of poverty. That's a group that is a cognizable class, and the exclusion could be remedied by increased jury fees."

We have repeatedly rejected this claim. (See, e.g., *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1214 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1076-1078 [255 Cal.Rptr. 352, 767 P.2d 619]; *People* v. *Milan* (1973) 9 Cal.3d 185, 195-196 [107 Cal.Rptr. 68, 507 P.2d 956].) "Claims of denial of a fair cross-sectional jury are analyzed by ascertaining whether a cognizable class has been excluded. (*People* v. *Fields* (1983) 35 Cal.3d 329, 345 [197 Cal.Rptr. 803, 673 P.2d 680].)" (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1214.) As in *People* v. *Harris, supra,* 47 Cal.3d at page 1078, "[Defendant] has not established that the persons excluded on hardship grounds in this case constitute a cognizable class. He suggests that the resulting panel consisted only of persons who did not need employment, or whose employers continued their salaries, but the record confirms neither this claim nor the implicit assertion that those persons who were excused constitute a cognizable class. [Fns. omitted.]"[2]

Furthermore, there was a lengthy discussion of the issue of jury fees, and what constitutes a "cognizable class," prior to jury selection. The record reflects that the trial court was fully aware of its duty to be "alert to prevent . . . excessive excuses on such grounds as sex, age, job obligations, or inadequate jury fees . . . ." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 273 [148 Cal.Rptr. 890, 583 P.2d 748].)

B. *Separate Guilt and Penalty Phase Juries.*

Prior to trial, it was agreed by the court and both parties that no evidence of defendant's prior murder convictions would be introduced at the guilt phase. Thereafter, before commencement of jury voir dire, the defense moved for separate guilt and penalty phase juries. Since the People's case-in-aggravation at the penalty phase would center around defendant's prior murder of his three children, counsel argued separate juries were necessary to permit full voir dire of the jury for penalty phase bias—while ensuring that the jurors would not learn of the convictions from the voir dire questions

---

[2]Among those persons excused on grounds of financial hardship were a dentist, an engineering consultant, a security guard, a plant breeder, a student and coach, a bicycle shop manager, and an employee of a Denny's restaurant. The group included both men and women, some married and some single, some having children and some without, as well as persons of Asian, Hispanic, and other surnames. In short, "Nothing on the face of the record suggests that those excused, or those who remained on the panel, could be classified as a 'cognizable group' under any set of criteria." (*People* v. *Harris, supra,* 47 Cal.3d at p. 1078, fn. 13.)

prior to the guilt phase. The trial court denied the motion for separate juries; it was renewed at the completion of the guilt phase and again denied.

■ Defendant contends he was thereby denied the right to a fair and impartial penalty phase jury. While recognizing that our death penalty statute calls for a single jury to hear both the guilt and penalty phases of a capital trial, he urges that a unitary jury is not mandatory, that separate juries are authorized on a showing of "good cause," and that good cause existed in this case due to the uniquely inflammatory nature of his prior conviction of the murders of his three young children.

■ Section 190.4, subdivision (c), provides: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes."

The statute thus expresses a clear legislative intent that both the guilt and penalty phases of a capital trial be tried by the same jury. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 102 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 753 [114 Cal.Rptr. 467, 523 P.2d 267].) "The preference for a single jury is by no means a one-sided matter; such a procedure may provide distinct benefits for both the prosecution and the defense. From the prosecution's point of view, the use of a single jury to determine both guilt and penalty may make it less likely that a juror's belief as to the inappropriateness of the death penalty will improperly skew the determination of guilt or innocence . . . . From defendant's perspective, the use of a single jury may help insure that the ultimate decision-maker in capital cases acts with full recognition of the gravity of its responsibility throughout both phases of the trial and will also guarantee that the penalty phase jury is aware of lingering doubts that may have survived the guilt phase deliberations." (*People* v. *Fields* (1983) 35 Cal.3d 329, 352 [197 Cal.Rptr. 803, 673 P.2d 680] [plur. opn. of Broussard, J.]; see *id.* at p. 374 [conc. opn. of Kaus, J.]; *Buchanan* v. *Kentucky* (1987) 483 U.S. 402, 417 [97 L.Ed.2d 336, 351-352, 107 S.Ct. 2906]; *Lockhart* v. *McCree* (1986) 476 U.S. 162, 180-181 [90 L.Ed.2d 137, 152-153, 106 S.Ct. 1758].)

Recently, we held that a pretrial arrangement for separate juries was proper where "the arrangement was agreed to, prior to trial, by both the

prosecution and the defense, and implemented by order of the court pursuant to its discretion under section 190.4, subdivision (c)." (*People* v. *Beardslee*, *supra*, 53 Cal.3d at pp. 101-102.) Absent such mutual consent and court approval, however, "[s]ection 190.4, subdivision (c) protects the prosecution and the defense against being deprived of the benefits of a single jury *against either party's will*." (*Id.* at p. 102, italics added.)

In this case the motion for separate juries was grounded solely on the defense desire to voir dire in one way for the guilt phase and a different way for the penalty phase. Unlike the situation in *Beardslee*, here the prosecutor opposed the motion, observing that there were neutral ways to frame questions to the prospective jurors to probe for potential biases regarding prior murder convictions without arousing their suspicions that defendant had in fact been convicted of murdering his children. For example, several special circumstances could have been defined, including the "prior murder" special circumstance, and the prospective jurors asked, regarding each such special circumstance, whether it would cause him or her to automatically vote for death. Or they could have been asked if they could be impartial regardless of whether the victim was male or female, an adult or child, related to the defendant or a stranger, etc.

Indeed, at one point during the hearing on the pretrial motions, when the court was defining the scope of its order excluding guilt phase evidence of the prior murders, defense counsel indicated, "As to whether we mention in voir dire how much negative information we give to the jury, with the court's ruling that we're talking about now, I'm sure that I could tailor my inquiry of the jurors in such a way as to alert them to the importance of the trial without really going into the matters we're seeking to exclude here."

In almost every capital trial, regardless of the special circumstances alleged, there will be evidence introduced at the penalty phase (i.e., evidence of the defendant's background, criminal record, or propensity for violence admissible under one or more statutory aggravating factors) which would otherwise be irrelevant or inadmissible in the determination of guilt. Defense counsel are routinely faced with difficult tactical decisions in having to fashion voir dire inquiries that probe for possible penalty phase biases regarding such evidence, while stopping short of revealing information otherwise prejudicial and excludable in the guilt phase. Certainly such will almost always be the case where the special circumstance alleged is a prior murder or murders. (See, e.g., *People* v. *Lanphear* (1980) 26 Cal.3d 814, 831 [163 Cal.Rptr. 601, 608 P.2d 689].) The mere desire to lessen or eliminate such tactical decisions in the voir dire of a capital jury, without more, and absent a mutual arrangement by the parties for separate juries approved by the trial court, does not constitute "good cause" for deviating from the clear

legislative mandate of section 190.4, subdivision (c)—that both the guilt and penalty phases of a capital trial be tried by the same jury.

### III. GUILT PHASE ISSUES

#### A. *Validity of the Search Warrant.*

██ Defendant renews his contention that the search and seizure of the manila folder and its contents from his apartment the day after the murder violated his federal and state constitutional rights. "Specifically, [he] contends that the police had no authority to open the folder; even if they legally opened the folder, the police had no right to read the papers therein; and even if the police could have legally read the papers, the state did not meet its burden of establishing that, at the time the police seized the papers, there was probable cause to believe that the papers were evidence of a crime."

Minutes after the shooting, the victim, still conscious, informed police arriving on the scene that she had been shot by Robert Nicolaus who lived in the "first apartment" on Erickson Street. Eyewitness Ron Landrith furnished a description of defendant, his vehicle, and its license plate number. Defendant's exact address was obtained through DMV records; officers arrived at his apartment less than 20 minutes after the shooting. On the following day defendant's car was located and the murder weapon was observed in plain view and seized from the passenger compartment. Homicide investigators also learned from the Department of Justice Command Center that defendant had been convicted of three counts of murder in 1964 and released on parole in 1977.

Armed with this information, the police obtained the first search warrant for defendant's Erickson Street apartment that same day.[3] The warrant directed officers to search for a number of items, including: "1. Letters, papers, bills tending to show the occupants of 2335 Erickson St. #1." The manila folder, containing a number of handwritten and typed documents, was seized from the top of defendant's desk during the search pursuant to this warrant. At oral argument, appellate counsel conceded that "the folder was out in plain view."

We conclude that the trial court properly denied defendant's pretrial motion to quash the warrant and suppress the contents of the seized folder. (§ 1538.5.) The search authorized under item No. 1 of the warrant was

---

[3]The search warrant also authorized the search of the two vehicles registered to defendant. A second search warrant for the apartment was also obtained on February 25, 1985, three days after the murder, and additional evidence was seized thereunder. We are here concerned only with documents in the manila folder seized from the apartment under the first warrant.

sufficiently particularized, permitting the officers to search for letters, papers and bills tending to show who occupied the apartment. Similar dominion-and-control clauses in warrants have been upheld by the courts. (See, e.g., *People* v. *Rogers* (1986) 187 Cal.App.3d 1001, 1005-1008 [232 Cal.Rptr. 294]; *United States* v. *Whitten* (9th Cir. 1983) 706 F.2d 1000, 1008-1009, cert. den. 465 U.S. 1100 [80 L.Ed.2d 125, 104 S.Ct. 1593].)

We note the record reflects that one police report indicated defendant may have had several addresses. Nor was there any evidence presented at the hearing to suggest the police knew defendant lived alone. The investigating officers' good faith is further reflected in the fact that a deputy district attorney's review of the search warrant application was obtained before it was presented to the magistrate. In any event, the officers acted entirely properly in seeking independent evidence to establish defendant's occupancy of the apartment, and defendant's control over any evidence seized therefrom, for presentation in court.

Defendant's further suggestion that even if the officers were authorized to look into the folder for indicia of occupancy, they were nevertheless not justified in "reading" and seizing the documents, is unavailing. "[W]hen conditions justify an agent in examining a ledger, notebook, journal, or similar item, he or she may briefly peruse writing contained therein. [Citations.] The justification may arise from 'a "reasonable suspicion" to believe that the discovered item is evidence,' [citation] . . . ; or it may arise from the authority conferred by a warrant to search for certain items which might reasonably be expected to be found within such a book . . . . In either case, the plain view doctrine would permit brief perusal of the book's contents and, consequently, its seizure if such perusal gives the examining agent probable cause to believe that the book constitutes evidence." (*United States* v. *Issacs* (9th Cir. 1983) 708 F.2d 1365, 1370, cert. den. 464 U.S. 852 [78 L.Ed.2d 150, 104 S.Ct. 165].)

For purposes of applying the plain view doctrine in this context, the search of the folder for indicia of occupancy here is no different than the federal agents' perusal of bound journals for rent receipts and counterfeit notes in *Issacs*. A rent receipt, bill stub or lease might reasonably be expected to be found in a folder on a desk. Finally, the trial court opined that the incriminating nature of the documents here in question "hit my eyes within seconds after I was asked to look at [them]," and that they were "immediately recognizable as evidence in this case." Our own review of the record confirms the validity of these findings.

B. *Sufficiency of Evidence of Premeditation and Deliberation.*

Defendant contends there is insufficient evidence of "premeditated and deliberate intent to kill" to support the jury's first degree murder verdict.

Defendant concedes he shot and killed his ex-wife, and that the evidence supports the inference that "he had been planning to harm her for some time." But he argues that "the killing itself did not conform to any of the plans" to "harm" Lisa outlined in the documents seized from his apartment. Counsel argued to the jury that the manner of the shooting did not suggest an intent to kill, and that instead, "it's entirely fortuitous that projectile struck the aorta, because if it had not struck the aorta, the organs that were injured were her pancreas and . . . a loop of bowel. The point is it was not deadly force until it hit the aorta, and there's no way a person shooting at that part of the body would know he was going to strike that major trunk line." Counsel also pointed to the fact that when defendant called Deke Bennett the day following the homicide, he asked Bennett "whom he had hurt." The jury was urged to draw an inference therefrom that defendant did not even know his attack upon Lisa had proved fatal.

■ "[W]e need not be convinced beyond a reasonable doubt that defendant premeditated the murder[ ]. The relevant inquiry on appeal is whether ' "*any* rational trier of fact" ' could have been so persuaded." (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020 [245 Cal.Rptr. 185, 750 P.2d 1342], quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], and *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781], original italics.)

We must determine whether there was evidence of (1) defendant's planning activity prior to the homicide; (2) his motive to kill, as gleaned from his prior relationship or conduct with the victim; and (3) the manner of killing, from which may be inferred that defendant had a preconceived design to kill. "[T]his court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942].)

■ Ample evidence under all three *Anderson* categories was presented in this case. We have fully set forth the record facts (*ante,* at pp. 561-570) and need not recount them all here. The many personal documents seized from defendant's apartment, and the testimony of numerous witnesses whose assistance defendant solicited to execute his plan, overwhelmingly established his premeditated and deliberate plan to kill his ex-wife. He stalked his victim for months, successfully conceived a plan to lure her into an alley, brought along two guns, an ax and battery acid, argued with and beat his victim before shooting her at point-blank range in the chest, momentarily left and then returned to fire a second shot into her, and then fled the state, remaining a fugitive until his arrest by FBI agents five months after the

murder. Defendant's motive to kill his ex-wife was patently clear from the evidence; his perceived grounds for revenge were threefold: Lisa stole his money, thwarted his efforts to have his three children buried together, and may have failed to obtain a valid divorce before remarrying after she left him. He also loathed her "particular stripe of Christianity." Finally, the manner of the fatal shooting of this victim at point-blank range, in her young son's presence, bespeaks none other than a merciless, planned and deliberate murder.

We conclude that the evidence is manifestly sufficient to support the verdict of first degree murder.

### C. *Evidence of Defendant's Hostility Toward Religion.*

 Several of the documents admitted into evidence over defendant's objection revealed his extreme dislike of religion, and in particular, Christianity. Defendant contends that "the court should have refused to admit the writings pertaining to [defendant's] personal philosophy and disdain for religion because they were irrelevant and were exceedingly prejudicial."

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) As defense counsel himself put it below: "The crux of the defense is degree of the homicide." Any evidence tending to establish a *motive* on defendant's part to kill his ex-wife was thus plainly relevant and probative to proving a premeditated, intentional first degree murder.

At the time Lisa was killed, she was very involved with her church. Defendant's writings reflect that he held practicing Christians in extreme disdain and contempt. He felt himself at war with Christian society. The very fact of the victim's involvement in the church itself furnished one possible motive for the fatal shooting. Defendant wrote that he "hoped to live long enough to see the end of religion." He identified the victim and her mother Ione as one of the "gang of four" Christians who "have been my downfall, my worst enemies. They have robbed me of my children, stolen all my money, and sought almost endlessly to return me to prison." He identified the "Christian" Lisa, amongst others, as being "totally without principle, without conscience, without mercy or any higher sensibility. Stupid, selfish, greedy, and vicious . . .". In my war against Christianity, I might logically start with these contemptible vermin." He described the victim and her mother as "Evil incarnate" and "The Satanical Sisterhood." In one passage he wrote, "Perhaps it is time that these Christian bandits got to know me better."

■ "Evidence Code section 352 permits the trial court 'to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption.' [Citation.] The court's exercise of discretion in admitting or rejecting proffered evidence will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice. [Citations.]" *(People* v. *Milner* (1988) 45 Cal.3d 227, 239 [246 Cal.Rptr. 713, 753 P.2d 669].)

■ While evidence of the type here in question obviously carried some potential for prejudice, it was patently relevant and probative to the prosecution's case-in-chief. The trial court did not abuse its discretion in admitting the documents.[4]

### D. *Instructions on Flight and Wilfully False Statements as Consciousness of Guilt.*

Defendant fled the state immediately after murdering the victim, traveled to New York City, Washington, D.C., and Charlottesville, Virginia, and was eventually arrested by FBI agents in York, Pennsylvania on July 20, 1985, for unlawful flight to avoid prosecution, some five months after his commission of the offense. Upon his arrest he gave a false name, and after waiving his *Miranda* rights, denied any knowledge of Lisa's murder or that he was wanted for the crime. When police told him the victim had identified him as her assailant before expiring, he claimed she was either confused or lying. Admitting he owned a blue Rambler, he claimed he had left the car parked at his apartment when he left Sacramento.

Accordingly, the jury was instructed with the standardized instructions on flight (CALJIC No. 2.52) and wilfully false statements (CALJIC No. 2.03) as those factors bear on consciousness of guilt. Defense counsel's objections to these instructions were overruled.[5]

---

[4]It is noteworthy that although defendant challenges the admissibility of the "manila folder documents" on various grounds on appeal, urging that they were highly prejudicial, the very same documents played a central role in the defense. At the close of the People's case-in-chief the defense rested without presenting any evidence. The thrust of defense counsel's argument to the jury was that defendant was a profoundly disturbed individual; counsel outlined the "themes" in the various documents, and quoted from them at considerable length, in urging that they reflected defendant's desire to harm, rather than kill, his ex-wife, and that defendant was therefore guilty, at most, of second degree murder.

[5]CALJIC No. 2.52 (1979 rev.) provides: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

CALJIC No. 2.03 (1984 rev.) provided: "If you find that before this trial the defendant made wilfully false or deliberately misleading statements concerning the charge upon which

Defendant argues that it was error to give these instructions because he ultimately admitted committing the homicide—leaving his state of mind *at the time the crime was committed* as the only remaining contested issue in the guilt phase. He urges that through these instructions the jury was permitted to draw irrational and irrelevant inferences about his state of mind at the relevant time.

We have rejected this argument respecting CALJIC No. 2.03 in *People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423], wherein we explained that: "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instruction[ ] advise[s] the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instruction[ ] [does] not address the defendant's mental state at the time of the offense and [does] not direct or compel the drawing of impermissible inferences in regard thereto."

Defendant's parallel claim regarding the instruction on flight as consciousness of guilt is likewise unavailing. "If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight. (§ 1127c.) 'The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. ([ ] § 1127c.)" (*People v. Mason* (1991) 52 Cal.3d 909, 943 [277 Cal.Rptr. 166, 802 P.2d 950].)

Defendant having fled the state immediately after committing the murder, the prosecution was plainly entitled to rely, in part, on such evidence "to support an inference of consciousness of guilt for the killing . . . ." (*People v. Perry* (1972) 7 Cal.3d 756, 776 [103 Cal.Rptr. 161, 499 P.2d 129]; *People v. Turner* (1990) 50 Cal.3d 668, 694 [268 Cal.Rptr. 706, 789 P.2d 887]; *People v. Crandell, supra,* 46 Cal.3d at p. 869.) Moreover, the analysis in *Crandell* regarding the instruction on false statements as evidence of consciousness of guilt (*ante,* this page) applies with equal force to defendant's claim of error directed at the flight instruction. Like the instruction on false or deliberately misleading statements, the flight instruction "[does] not address the defendant's mental state at the time of the offense and [does] not

he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

direct or compel the drawing of impermissible inferences in regard thereto." (*Crandell, supra,* 46 Cal.3d at p. 871.)

### E. *Instruction Pursuant to CALJIC No. 8.75*

Defendant next contends that the trial court's instruction pursuant to CALJIC No. 8.75 impermissibly restricted the jury's ability to consider the full range of possible lesser offenses shown by the evidence. We have repeatedly rejected the identical claim. (See, e.g., *People* v. *Hunter* (1989) 49 Cal.3d 957, 975-976 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 241-242 [253 Cal.Rptr. 55, 763 P.2d 906].)

In *People* v. *Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572], we construed our holding in *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809] "to authorize an instruction that the jury may not *return a verdict* on the lesser offense unless it has agreed . . . that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense." (46 Cal.3d at p. 329, original italics.) This is precisely what CALJIC No. 8.75 does. As in *People* v. *Hunter, supra,* 49 Cal.3d at page 976, "we find nothing in the pertinent language of the instruction as given here or in the record of the jury's deliberations as a whole, to suggest that the jury believed it must return a verdict on the greater offense before it could consider or discuss the lesser included offenses. (*People* v. *Hernandez* [(1988)] 47 Cal.3d [315] at pp. 352-353 [253 Cal.Rptr. 199, 763 P.2d 1289].) Accordingly, we find no error in the court's instructing in the language of CALJIC No. 8.75."

### IV. PENALTY PHASE ISSUES

### A. *Introduction of Document Reflecting Defendant's Views on Christianity.*

At the penalty phase defendant testified that although he never intended to kill Lisa, he did intend to harm her. On cross-examination, the prosecutor asked defendant about the significance of his written remarks regarding his views on Christianity in People's exhibit No. 34. Defendant had written, "In my own case, nihilism seems to have been the inevitable result of being harried and tormented by Christians. Not Jews or Moslems, but lowly, filthy, rotten, contemptible Christians." Defendant testified that Lisa was one of the four Christians "of a particular stripe" (fundamentalist Christian) that had caused him "the most trouble since [his] release from prison." He explained

that when he and Lisa disagreed on theological matters, she would take the position that "she was on God's side and [he] was on Satan's side."

There was no defense objection to this line of questioning until the prosecutor asked, "Who is Nietzsche?," in reference to several quotes of the German philosopher contained in the document. Defense counsel objected on grounds that the prosecutor was now getting into "philosophical things" that did not fall within the statutory aggravating factors. The prosecutor countered that the line of questioning was relevant to motive; the court agreed and overruled the objection. When the prosecutor next asked defendant whether one of the quotations from Nietzsche—characterizing Christianity as "the one great curse" and "the one innermost perversion"—expressed the way he felt about Lisa and her "stripe of Christianity," defendant testified he wrote down the quote thinking it was "an interesting commentary" that, in a "more generalized" sense, was useful in helping him cope with the "continual war" he had been "fighting" for 30 years. The line of questioning was then dropped, and the document admitted into evidence the following day over defense counsel's renewed objection.

 Defendant contends that the trial court erred in allowing the prosecution to cross-examine him regarding the document, and in admitting it into evidence. He characterizes the references to Christianity therein as "irrelevant and inherently prejudicial." We disagree.

 "Once the defense has presented evidence of circumstances admissible under [section 190.3,] factor (k) . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].)

 Notwithstanding the jury's guilt phase determination that this was a premeditated and intentional murder, defendant took the stand for the first time at the penalty phase and testified he never intended to kill Lisa, but only to harm her. Although he characterized his penned hatred of her "stripe of Christianity" as merely "interesting commentary" which he found "useful" in his "continual war"—the evidence was plainly relevant to rebut the penalty phase defense and reaffirm what loomed as a strong, contributing motive for this murder; defendant's bitter hatred and contempt of his ex-wife's affiliation with a fundamentalist Christian sect.

In any case, it is not reasonably possible that this evidence prejudiced the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) The jury had already considered numerous other documents and evidence at the guilt phase establishing defendant's scorn and

hatred of religion and, in particular, the sect of Christianity to which Lisa belonged. All such evidence was generally relevant and admissible at the penalty phase as a "circumstance[ ] of the crime of which defendant was convicted. . . ." (§ 190.3, factor (a).) Finally, as noted, much of the prosecutor's cross-examination of defendant in this vein passed without defense objection.

### B. *Exclusion of Documents Relied on by Defense Expert.*

Dr. Kenneth Hjortsvang testified as a psychiatric expert witness for the defense at the penalty phase. In preparing his opinion in this case he interviewed defendant twice, and reviewed a mass of police reports, autopsy reports, transcripts, letters written by defendant, professional articles on the psychiatric mechanisms of child murderers, and other documents relating to the instant case as well as defendant's trial for the murder of his three children. Dr. Hjortsvang concluded defendant suffered from a mixed characteristic personality disorder—exhibiting traits of paranoia, schizoid personality, compulsive elements, and narcissism—and that he had planned to harm Lisa but not kill her.

Defense counsel sought to have admitted into evidence various journal articles, and several letters written by defendant, upon which Dr. Hjortsvang had relied, in part, in making his evaluation. The trial court refused to formally admit the documents into evidence. Defendant claims the ruling denied him his right to present evidence relevant to his defense.

Evidence Code section 802 provides, in pertinent part, that "[a] witness testifying in the form of an opinion *may state on direct examination* the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training and education) upon which it is based . . . ." (Italics added.) Here, Dr. Hjortsvang did testify at some length about the many documents he reviewed in the course of his evaluation of defendant in this case. Nothing in Evidence Code section 802, however, requires a trial court to admit into evidence documentary or other evidence of matters relied on by an expert witness in forming his or her opinion.

We have observed that " '[w]here expert opinion evidence is offered, much must be left to the discretion of the trial court' (*People* v. *Cole* [(1956)] 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435])." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 373 [690 P.2d 709, 46 A.L.R.4th 1011].) It is well established that the court may, within its sound discretion, exclude the hearsay basis of an expert's opinion. (Evid. Code, § 352; see, e.g., *People* v. *Fair* (1988) 203 Cal.App.3d 1303, 1310-1311 [250 Cal.Rptr. 486]; *People* v.

*Bowker* (1988) 203 Cal.App.3d 385, 390 [249 Cal.Rptr. 886]; *People* v. *Young* (1987) 189 Cal.App.3d 891, 913 [234 Cal.Rptr. 819]; *People* v. *Odom* (1980) 108 Cal.App.3d 100, 115-116 [166 Cal.Rptr. 283] [exclusion of reports relied on by expert witness proper where expert testified about the reports].)

■ " 'While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.]' " (*People* v. *Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].)

■ No abuse of discretion is shown in the exclusion of the documents. Moreover, insofar as Dr. Hjortsvang testified about the critical portions of the documents and letters that informed his opinion, the admission of the documents themselves into evidence would have merely been cumulative. (See, e.g., *People* v. *Milner, supra*, 45 Cal.3d at p. 240.)

C. *Allocution.*

■ Defendant requested that he be allowed to personally address the jury without being subject to cross-examination. The court denied the request; defendant now asserts such denied him his constitutional right to allocution.

We have held that a capital defendant has no right of allocution. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 511 [250 Cal.Rptr. 550, 758 P.2d 1081], cert. den. 490 U.S. 1012 [104 L.Ed.2d 169, 109 S.Ct. 1656]; *People* v. *Robbins* (1988) 45 Cal.3d 867, 888-890 [248 Cal.Rptr. 172, 755 P.2d 355], cert. den. 488 U.S. 1034 [102 L.Ed.2d 981, 109 S.Ct. 849].) Moreover, when the trial court asked for an offer of proof as to what defendant would say to the jury, counsel stated that defendant wanted to explain the meaning of some of the words he had used in several documents seized from his apartment, and wanted to inform the jurors that he had adjusted well in prison and would continue to be a good prisoner. As the trial court aptly observed, defendant would thereby have been "testifying" as to "new factual information without the benefit of an oath and without cross-examination," a patently improper procedure.

D. *Improper Argument Under Booth v. Maryland.*

 Defendant next contends that during closing argument, the prosecutor improperly urged the jury to return a death verdict on the basis of the crimes' purported impact on the families of the victims.

The prosecutor argued as follows: "Now, I'm sure defense counsel will argue to you, and if he doesn't, you're still entitled to consider, some basis for sympathy for Mr. Nicolaus. And you might feel some sympathy for him, but I urge you to consider that sympathy works both ways. And consider the consequences that Mr. Nicolaus has inflicted on not only the people that he killed, but on the other people. First of all, he took Jean Laras' two children from her, and he took Heidi from Lisa. Lisa had to live with that for 21 years. She ended up in a mental institution for a month and a half following the killing of Heidi. [¶] And now, Mr. Nicolaus has taken Lisa from her children. Genesis [one of Lisa's surviving children] has no mother. So when you consider sympathy for Mr. Nicolaus, consider that it goes both ways. And if you weigh that factor, there's really no comparison."

In *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], the high court held that the admission of so-called victim impact statements in capital sentencing proceedings violated the principle that a sentence of death must be related to the moral culpability of the defendant. In *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-812 [104 L.Ed.2d 876, 882-884, 109 S.Ct. 2207], the court followed *Booth* in concluding that the presentation of prosecutorial argument relating to such matters might likewise violate a defendant's Eighth Amendment rights. Recently, however, the high court overruled both *Booth* and *Gathers* in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].

Even before *Payne* v. *Tennessee*, the court in *Booth* took care to note that "[s]imilar types of information may well be admissible because they relate directly to the circumstances of the crime." (482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451].) This court also recognized that "*Booth* and *Gathers* [did] not extend to evidence or argument concerning the nature and circumstances of the capital offense or the effect of that offense on the victim. . . . [Nor do they] extend to . . . other criminal activity involving the use or threat of force or violence or the effect of such criminal activity on the victims . . . ." (*People* v. *Benson* (1990) 52 Cal.3d 754, 797 [276 Cal.Rptr. 827, 802 P.2d 330], citing *People* v. *Marshall* (1990) 50 Cal.3d 907, 929 [269 Cal.Rptr. 269, 790 P.2d 676].)

Here, the jurors might reasonably infer that defendant's act of killing his three children in 1964 was indeed motivated, in one sense, by his desire to

"impact" upon the life-style of his ex-wife Lisa. Similarly, it is a circumstance of the instant crime that defendant at one point weighed or considered the impact of Lisa's murder on her children. He initially drew up alternate plans for the manner in which he would kidnap or kill Lisa, depending upon whether her children were with her during the confrontation. Ultimately, he fatally shot Lisa as she sat in her Volkswagen with her three-year-old son in the backseat. In any event, the prosecutor's brief comments, referring as they did to factual matters of which the jury was already fully apprised through properly admitted evidence, could not possibly have diverted the jurors from their task of determining the appropriate penalty. (See *People* v. *Douglas* (1990) 50 Cal.3d 468, 537 [268 Cal.Rptr. 126, 788 P.2d 640].)

E. *Instruction Pursuant to Modified CALJIC No. 1.00.*

At the penalty phase the jury was instructed with a modified version of CALJIC No. 1.00, which read: "You must not be swayed by mere conjecture, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, *and that you will reach a just verdict, regardless of what the consequences of such verdict may be.*" (Italics added.)

 Defendant argues that the instruction as given "seriously misstates the function of the penalty phase jury . . . deprives the capitally accused of his right to an individualized sentencing determination whereby the jury decides whether the consequence of its decision (life or death) is proper, and . . . diminishes the jury's grave responsibility 'to determine which first degree murderers shall live and which shall die.' (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 303.)"

We have addressed this identical argument in prior cases. "The instruction has been considered inappropriate at the penalty phase (see *People* v. *Brown* (1985) 40 Cal.3d 512, 537, fn. 7 [250 Cal.Rptr. 604, 758 P.2d 1135]), but it must be deemed harmless where, as here, the record indicates that the jury fully understood the grave consequences of its penalty decision. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 102, fn. 25 [241 Cal.Rptr. 594, 744 P.2d 1127].) In addition, we observe that the instruction does not ask the jurors to wholly ignore the consequences of their decision, but simply asks them to reach a 'just' verdict regardless of the consequences of such a verdict." (*People* v. *Wade* (1988) 44 Cal.3d 975, 998-999 [244 Cal.Rptr. 905, 750 P.2d 794]; see also *People* v. *Keenan, supra,* 46 Cal.3d at pp. 517-518; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 152 [249 Cal.Rptr. 320, 756 P.2d 1348].)

The significance and gravity of the penalty determination were emphasized to the jury during closing arguments. As the prosecutor argued, "[I]n this most important sense, this phase of the case is dissimilar to the first phase of the case, because you're no longer really fact finders or you're not primarily fact finders. You're not attempting so much to resolve disputes in the evidence as you are attempting to determine what level of accountability you're going to impose on Mr. Nicolaus for what he's already proven to have done. [¶] In this phase of the case, you're not fact finders. You're the conscience of the community. The question that you have to address is: Are Mr. Nicolaus' crimes so grievous an affront to humanity that the only adequate response is the death penalty. You're going to be making a moral judgment, Ladies and Gentlemen."

We conclude the jury could not have been misled into believing that, in reaching its penalty verdict, it was to disregard the consequences of that determination. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 718 [248 Cal.Rptr. 69, 755 P.2d 253].)

F. *Extreme Mental or Emotional Disturbance as a Mitigating Factor.*

In accordance with section 190.3, factor (d) (CALJIC No. 8.84.1), the jury was instructed to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant asserts that this instruction, by referring to an "extreme" mental or emotional condition, misled the jury into believing that any "lesser disturbance would not suffice and could not be considered." We cannot agree.

Pursuant to CALJIC No. 8.84.1, the jury was given an "expanded" factor (k) instruction; it was told to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." The jurors were also instructed that they "may consider as a mitigating factor residual or lingering doubt as to whether the defendant intentionally killed the victim or acted with premeditation and deliberation."

"In *People v. Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], we concluded that this ' "catchall" [expanded factor (k)] provision is sufficient to permit the penalty jury to take into account a mental condition

of the defendant which, though perhaps not deemed "extreme," nonetheless mitigates the seriousness of the offense.' (*Id.* at p. 776; accord, *People* v. *Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Brown, supra,* 46 Cal.3d at pp. 457-458; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720-721 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal.Rptr. 1, 753 P.2d 1052].)" (*People* v. *Hunter, supra,* 49 Cal.3d at pp. 987-988.)

G. *Age as a Factor in the Penalty Determination.*

Over defense counsel's objection, the trial court instructed the jury that in reaching its penalty determination it could consider, among the other statutory factors enumerated in section 190.3, ". . . the age of the defendant at the time of the crime. . . ." Defendant maintains that the instruction, together with the prosecutor's argument, created a danger that the jury would consider defendant's age as an aggravating circumstance, a factor over which defendant had no control.

The jury was properly instructed. In *People* v. *Lucky* (1988) 45 Cal.3d 259 [247 Cal.Rptr. 1, 753 P.2d 1052], we explained that mere chronological age is not in and of itself an aggravating or mitigating factor. "In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience of morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue such age-related inference in every case." (*Id.* at p. 302.)

Here, the prosecutor argued that, "I guess you can consider [defendant's] age at the time he killed his children, 32 years old. And how old he was at the time he killed Lisa, 52. And how old he is now, 54. The point to be made here (*sic*) the defendant is not a young man, a man whose hormones are driving him out of control perhaps, or a man who just doesn't have experience, who was still in the midst of a rebellious youth." These comments were plainly directed at an "age-related matter" (defendant's maturity) and were not improper argument.

However, the prosecutor also argued to the jury, "You can consider Mr. Nicolaus' age also in terms of the fact that the death penalty for Mr. Nicolaus will not deprive him of a long or potentially productive life as it would a young man." This was clearly improper argument. It did not purport to refer to any age-related matter that might have impacted defendant's character. Instead, it implied that the life of an individual more advanced in years might somehow be worth less than that of a younger individual. Although such a concept may have valid application in the determination of

certain compensatory tort damages, it has no proper place in a death penalty case. " '[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989, 98 S.Ct. 2954], quoting *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978].) The comment in question bore no relation to this defendant's individual character or background, or to the circumstances of this particular offense.

We have determined that the improper argument was nonprejudicial. The comment was very brief, and presented no new factual matter for consideration by the jury, which was already well aware of defendant's age. The aggravating evidence in this case—in particular, the circumstances of defendant's planned and premeditated murder of his ex-wife (§ 190.3, factor (a)), and his prior conviction of the murders of his three children (§ 190.3, factor (c))—was, simply put, overwhelming. The one-sentence comment could not have affected the penalty verdict.

H. *Instruction on Mercy.*

 Defendant contends the trial court erred in refusing his special instruction which would have expressly informed the jury it could exercise mercy and reject the death penalty.

Since the high court's decision in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we have consistently rejected this contention. (See, e.g., *People* v. *Andrews* (1989) 49 Cal.3d 200, 227-228 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1182 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1067 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1322-1323 [248 Cal.Rptr. 834, 756 P.2d 221]; *People* v. *Lucky*, *supra*, 45 Cal.3d at pp. 297-299; *People* v. *Miranda*, *supra*, 44 Cal.3d at p. 102.)

We note that in this case the jurors were instructed, pursuant to former CALJIC No. 8.84.2, that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." They were also given an "expanded factor (k)" instruction, which told them they could consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character, or record, that the defendant offers as a basis for a

sentence less than death, whether or not related to the offense for which he is on trial." Moreover the prosecutor, in his closing argument, expressly identified *mercy* as a valid consideration in the penalty determination.

### I. *Constitutional Challenges to the 1978 Death Penalty Statute.*

 Defendant raises various challenges to the constitutional validity of the 1978 death penalty statute. None has merit.

He contends the trial court was under a constitutional obligation to instruct the jurors, pursuant to his specially requested instructions, that they could return a verdict of death only if they were persuaded *beyond a reasonable doubt* of the existence of each aggravating factor, that the aggravating factors outweighed the mitigating factors, and that death was the appropriate penalty.

We have rejected these identical contentions in numerous prior cases and have no occasion to reconsider those holdings here. (See, e.g., *People v. Allison* (1989) 48 Cal.3d 879, 898-899 [258 Cal.Rptr. 208, 771 P.2d 1294] [existence of aggravating factors]; *People v. Keenan, supra,* 46 Cal.3d at p. 521 [aggravating circumstances outweighing mitigating circumstances]; *People v. Hamilton, supra,* 46 Cal.3d at p. 151 [death as the appropriate penalty]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant further contends the jurors should have been instructed that they must unanimously find the truth of any aggravating circumstances upon which their penalty verdict rested, and that the same prior convictions used to render him death eligible (prior-murder special circumstance) could not also be considered as aggravating circumstances under section 190.3, factor (a) or (b). Once again, we have repeatedly rejected these identical claims. (See, e.g., *People v. Allison, supra,* 48 Cal.3d at p. 899 [unanimity as to aggravating factors]; *People v. Adcox, supra,* 47 Cal.3d at p. 272 [dual use of prior convictions].)

 Lastly, defendant argues it was constitutional error to fail to instruct the jury that a sentence of life without parole means the defendant will never be considered for parole. We have rejected this claim as well. (See *People v. Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) To have so instructed the jury would have been an incorrect statement of the law. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1277-1278 [270 Cal.Rptr. 451, 792 P.2d 251].) Nor are we persuaded by defendant's assertion that because the jury was aware he had been paroled after serving a prison sentence for the murders of his children, they might have believed he could

again be paroled if a life sentence were imposed in the instant case. The jury knew only that his prior murder convictions were of the second degree; they never learned he had initially been convicted of first degree murder and sentenced to death.

### J. *Instruction Pursuant to Former CALJIC No. 8.84.2.*

The jury was instructed pursuant to former CALJIC No. 8.84.2 (1986 rev.) as follows:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant. After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

"In weighing the various circumstances, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence and circumstances are so substantial in comparison with the mitigating circumstances, that it warrants death instead of life without parole."

Defendant contends that the instruction suffered from multiple constitutional defects, and that the resulting death sentence violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Each of his claims lacks merit.

He argues that instructing the jury to "simply" determine under the relevant evidence which penalty is justified "trivialized the enormity of the sentencing task and undermined the jury's sense of responsibility and gravity about its role." We have recently rejected the identical claim, finding that the instruction's utilization of the adverb "simply" merely "describe[s] the mechanics of the jury's normative process." (*People* v. *Cox* (1991) 53 Cal.3d 618, 680 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1243 [283 Cal.Rptr. 144, 812 P.2d 163].)

He challenges the instruction's charge that, "To return a judgment of death, each of you must be persuaded that the aggravating evidence and circumstances *are so substantial in comparison with* the mitigating circumstances, that it *warrants death* instead of life without parole." (Italics added.) He asserts that "[t]his critical sentence equates the concept of 'so substantial' with permission to impose death." Moreover, he deems the phrase "so substantial" to be "vague, directionless, and impossible to quantify." He argues that "the use of the words 'warrants death' allowed the jury to impose death not because death fit the crime, or was *the* correct punishment, but because it was 'warranted,' a broadreaching term generally synonymous with 'authorized.'" (Original italics.) And he concludes that the instruction as a whole "created an unconstitutional presumption of death."

We have recently rejected similar challenges to the instruction. In *People v. Bittaker* (1989) 48 Cal.3d 1046, 1108-1109 [259 Cal.Rptr. 630, 774 P.2d 659], we specifically approved of the "so substantial" language. (See also *People v. Sully, supra,* 53 Cal.3d at pp. 1243-1244.) And in *People v. Duncan* (1991) 53 Cal.3d 955 [281 Cal.Rptr. 273, 810 P.2d 131], we explained, "We do not think that there is a reasonable likelihood that any of the jurors would have concluded that, even if the mitigating factors outweighed those in aggravation, the 'so substantial in comparison with' language nevertheless might demand imposition of the higher punishment. (See *Boyde v. California* (1990) 494 U.S. 370, 376 [108 L.Ed.2d 316, 326, 110 S.Ct. 1190].)" (*Duncan, supra,* 53 Cal.3d at p. 978.) "[O]ur statute and instruction give the jury broad discretion to decide the appropriate penalty by weighing all the relevant evidence. The jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*Id.* at p. 979.)

## V. Conclusion

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

Appellant's petition for a rehearing was denied December 11, 1991.