[No. S025121. Dec. 3, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CLARENCE TAYLOR, Defendant and Appellant.

**COUNSEL**

Susan K. Marr, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—Defendant Robert Clarence Taylor appeals from a judgment of the Orange County Superior Court imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187),[1] attempted murder (§§ 664, 187), burglary (§ 459), and two counts of robbery (§ 211), accompanied by a special circumstance finding that he committed the murder while engaged in the commission of a burglary and robbery (§ 190.2, former subd. (a)(17)(i), (vii)), and an additional finding that he personally used a firearm during these crimes. Defendant's appeal is automatic. (§ 1239, subd. (b).) As will appear, we conclude we should affirm the judgment in its entirety.

## I. FACTS

Defendant Taylor, together with codefendants James Norman DeWitt and Nanette Scheid (see *People v. Scheid* (1997) 16 Cal.4th 1 [65 Cal.Rptr.2d 348, 939 P.2d 748] (*Scheid*), involving the separate appeal of this codefendant), burgled, robbed, shot and killed Ryoko Hanano (Ryoko) and attempted to kill her husband Kazumi Hanano (Kazumi), leaving him a quadriplegic. The victims had advertised their black 1984 Chevrolet Corvette for sale. On July 8, 1988, Scheid, evidently posing as a prospective buyer, called the victims' son, Dean, and inquired about the car. Two days later, Scheid talked to Kazumi, who gave her directions to his house in Anaheim. She arrived there and test-drove the car, telling Kazumi she would return with her boyfriend.

An hour later, Scheid returned, accompanied by defendant and DeWitt. After a test drive, defendant agreed to the sale and asked Kazumi to sign the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

pink slip and prepare a bill of sale. While the victims were engaged in paperwork to complete the sale, defendant directed Sheid to leave the scene, and he and DeWitt then each displayed handguns, handcuffed the Hananos together and brought them into their bedroom. Defendant pulled the mattress partly off the bed, searching for hidden jewelry or money, then forced the victims to kneel facedown with their heads on the mattress. After inquiring about money in the house, defendant pulled the mattress over the Hananos' heads, telling DeWitt to search for twine to bind the victims' legs. Someone then shot each victim. Kazumi remained conscious enough to hear defendant tell DeWitt they should look for money and jewels in the house. Dean found his parents a few hours later, still handcuffed and kneeling next to the bed. He called for emergency assistance, and the responding officers verified that Ryoko was dead from a gunshot wound. Subsequent police investigation led to the discovery of the stolen Corvette and defendant's arrest after he was seen driving it.

Defendant presented no defense. Codefendant Scheid claimed she was innocent and uninvolved in the robbery and murder. Codefendant DeWitt, without testifying, nonetheless relied on a similar defense derived from a statement defendant gave to police, claiming sole responsibility for the crimes.

At the penalty phase, the prosecution introduced defendant's four prior felony convictions (two robberies, a burglary, and a conviction for unlawful sexual intercourse with a minor). The prosecution also presented evidence of six prior unadjudicated incidents of criminal activity, including forcible rape, attempted murder, robberies, and assaults. Finally, the prosecution elicited victim impact evidence from Dean and Kazumi describing how their lives had been changed by Ryoko's murder and Kazumi's shooting and resultant paralysis.

Defendant elected to testify at the penalty phase regarding his physically abusive father, his biracial heritage, his cocaine use, his present love for a woman inmate, and the unintentional nature of the Hanano shootings (defendant claimed he panicked under the influence of cocaine). Defendant also attempted to minimize or mitigate his role in two of his prior crimes.

Other defense witnesses included defendant's mother, sister, and friends, each of whom gave various mitigating background and character evidence. Defendant also introduced mitigating testimony from a counselor for biracial children, a former prison director, and a family counselor.

As previously noted, defendant was found guilty of murder with special circumstances and sentenced to death. Codefendant DeWitt was likewise

found guilty of murder with special circumstances and sentenced to life imprisonment without the possibility of parole. Codefendant Scheid was found guilty of murder, but was not charged with special circumstances. We consider here only defendant Taylor's appeal.

## II. CONTENTS

### A. *Guilt Phase*

#### 1. *Prosecutorial Misconduct*

■ Defendant first argues the prosecutor committed prejudicial misconduct during the guilt phase. We find no prejudicial misconduct.

##### a. *Rape victim hypothetical question*

The prosecutor posed to Kazumi's physician, Dr. Parsons, a hypothetical question asking whether a traumatized rape victim, feeling "dehumanized" and "defiled," might "block" her memories of the incident. The doctor agreed this might occur as a result of the trauma. Defendant, whose ensuing motion for mistrial was denied, claims the hypothetical question allowed the prosecutor to "preview" penalty phase evidence of defendant's prior commission of forcible rape, a matter inadmissible at the guilt phase, thereby generating sympathy for the rape victim and causing the jury to speculate whether defendant or codefendant DeWitt might have raped someone.

As the Attorney General observes in response, the prosecutor posed the question on redirect examination after counsel for defendant and codefendant DeWitt had each asked Dr. Parsons hypothetically whether a traumatized person (presumably referring to victim Kazumi) might suffer impairment of his perceptive ability. Therefore, the prosecutor's redirect examination of Dr. Parsons was closely related to the subject matter the defense raised on cross-examination. It is true, as defendant observes, that the prosecution initially introduced the topic of suppressed memory during direct examination of Dr. Parsons. But we see no reason why the prosecutor could not continue to explore the matter hypothetically in response to defense cross-examination of Parsons.

Defendant accuses the prosecutor of using the rape victim hypothetical question as a device for previewing penalty phase evidence regarding defendant's forcible rape of Patti B., but we cannot assume this from the record before us. Even assuming arguendo the prosecutor had such a motive, it is not reasonably probable defendant was prejudiced by the tactic. The prosecutor made no effort during the guilt phase to link either defendant or

codefendant DeWitt to this hypothetical rape, and indeed no evidence of any rape was admitted during the guilt phase. Contrary to defendant's argument, the prosecutor's question was responsive to the defense's cross-examination of Dr. Parsons and was not objectionable as involving facts not in evidence or implying the prosecutor knew some facts unavailable to the jury. We find no prejudicial misconduct here.

### b. Attacking defense counsel

■ Defendant also complains that the prosecutor implied that defense lawyers generally use various "tricks" and "moves" to try to win their cases by confusing the witnesses. The matter arose after Kazumi testified that he remembered Deputy District Attorney Bryan Brown representing the prosecution at the preliminary examination. Counsel for codefendant Scheid, evidently hoping to cast some doubt on Kazumi's ability to remember such details, called Chief Deputy District Attorney James Enright to testify that he, and not Brown, was the prosecutor at defendant's preliminary examination.

On cross-examining Enright, the prosecutor asked if he was familiar with some of the "tricks" used by criminal defense lawyers. The court sustained a codefendant's objection to the word "tricks," but allowed the prosecutor to inquire whether Enright had ever seen similar defense "moves" used on a "hypothetical" witness who testified for hours from a wheelchair and suffered from pain, and who was then asked to remember who had prosecuted the preliminary examination. After the court overruled a codefendant's objection, Enright replied, "That's a new one," and the matter was dropped. During closing arguments, however, the prosecutor continued with this theme, observing that codefendants' counsel had used all their "tricks" to confuse Kazumi in his vulnerable state.

Defendant now argues the prosecutor's remarks constituted an attack on the credibility and integrity of defense lawyers generally (see *People v. Welch* (1999) 20 Cal.4th 701, 752-753 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *United States v. Boldt* (1st Cir. 1991) 929 F.2d 35, 40-41), coupled with an improper inflammatory reference to the surviving victim's pain and suffering. The Attorney General responds that the references to defense lawyers' tactics and to Kazumi's physical state were fair comments on the evidence not reaching the level of misconduct. Although we agree no misconduct occurred, we doubt the prosecutor's inquiry regarding defense "moves" in other cases was relevant to the issues, a contention not raised in this appeal.

Defendant's prosecutorial misconduct argument is similar to one we rejected in *People v. Medina* (1995) 11 Cal.4th 694, 759 [47 Cal.Rptr.2d 165,

906 P.2d 2], where we stated: "Finally, defendant contends the prosecutor demeaned defense counsel's integrity by observing that 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something . . . .' In our view, the prosecutor's foregoing argument was unobjectionable. To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's integrity. [Citations.]"

We think the prosecutor's comments in the present case, referring to defense "tricks" or "moves" used to demonstrate a witness's confusion or uncertainty, fall within the same category as that in *Medina*, involving no improper personal attack on defense counsel's integrity. We observe that, with the exception of *People v. Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673], involving pervasive and egregious prosecutorial misconduct affecting all phases of trial, none of the "personal attack" cases cited by defendant found reversible misconduct.

As for the prosecutor's references to Kazumi's suffering, we find no improper attempt to place "victim impact" evidence before the jury. In context, we think the prosecutor was merely calling the jury's attention to the fact that Kazumi's physical state naturally made him susceptible to minor mistakes in his testimony, such as failing to recall which person conducted a particular preliminary examination. Moreover, the jury was well aware, from the other testimony in the case, that Kazumi suffered from severe paralysis and pain. Any prosecutorial disclosure of the impact of defendant's assault on Kazumi was entirely cumulative to other evidence in the case.

### 2. *Crime Scene Photographs and Videotape*

The prosecutor introduced eight crime scene photographs, several depicting the handcuffed victims. The prosecutor also introduced a videotape of the crime scene, showing the physical scene at the time the investigators first arrived. Defendant contends that these photographs and videotape were irrelevant to the guilt phase, that the court abused its discretion in admitting them, and that their admission prejudiced him at both the guilt and penalty phases of his trial. We disagree.

We recently reviewed the applicable principles in a case involving a similar photograph, depicting the same handcuffed victims, introduced at the retrial of codefendant Nanette Scheid. (See *Scheid, supra,* 16 Cal.4th 1.) We found the photograph relevant for reasons equally applicable here: First, the photograph supported both Kazumi's testimony regarding the circumstances

of the crime and Dean's testimony about the shocking scene he encountered, bolstering those witnesses' credibility. (*Id.* at p. 15.) Second, the photograph was relevant to establish that a murder had in fact occurred. (*Ibid.*) And third, the photograph showed that the victims had been handcuffed together, supporting the prosecutor's theory of a *planned* robbery. (*Id.* at pp. 15-16.)

Contrary to defendant's present argument, we stressed in *Scheid* that the cumulative nature of the photograph, and the availability of other evidence to establish the prosecution's case, would not lessen the photograph's relevance or require its exclusion. (*Scheid, supra,* 16 Cal.4th at pp. 15-16.) For the same reasons, we find relevant the various photographs and videotape admitted in this case. (See also *People v. Box* (2000) 23 Cal.4th 1153, 1198-1199 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Defendant's reliance on *People v. Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669] is unpersuasive. For the reasons we stated in *Scheid, Turner* is distinguishable and "does not purport to create a broad rule rejecting or limiting the admissibility of crime scene photographs in all felony-murder cases." (*Scheid, supra,* 16 Cal.4th at p. 18.)

As for the trial court's discretionary decision to admit the photographs and videotape despite their possible prejudicial effect, we find no abuse. Defendant argues the various photographs were so gruesome as to likely inflame the jury's passions. Again, *Scheid* is instructive. There, in resolving a similar claim, we observed that the decision to admit victim photographs is a discretionary matter we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value. (*Scheid, supra,* 16 Cal.4th at p. 18; see Evid. Code, § 352.) In *Scheid,* the photograph at issue depicted these same victims facedown without any close-up view of their wounds or contorted facial expressions. We reviewed the relevant aspects of the photograph, as summarized above, and found it "not unduly gory or inflammatory." (*Scheid, supra,* 16 Cal.4th at p. 19.) We also noted that trial testimony had detailed all the facts regarding the crime scene and victims, so that the prejudicial impact of the photograph was substantially minimized. (*Id.* at p. 20.)

In the present case, we have examined the photographs and videotape in question, and although some of the photographs are unpleasant to view, showing the bloodied bodies of defendant's victims, they are not unduly gruesome or inflammatory and, as previously noted, each bears some relevance to issues in the case. All photographs of murder victims are disturbing (*Scheid, supra,* 16 Cal.4th at p. 19), yet the photographs in question, showing the victims lying facedown and without close-up views of their wounds, are less graphic or gruesome than those we have encountered in

other cases. (See, e.g., *People v. Turner, supra*, 37 Cal.3d at pp. 320-321 & fn. 9.) In sum, the trial court could properly conclude, in its discretion, to admit these photographs and the crime scene videotape as having probative value outweighing their potentially prejudicial effect. Accordingly, we need not consider the Attorney General's alternative argument that any error in admitting them was harmless.

Defendant also contends the trial court erred in failing to state for the record that it had weighed potential prejudice against probative value under Evidence Code section 352. (See *People v. Farmer* (1989) 47 Cal.3d 888, 906 [254 Cal.Rptr. 508, 765 P.2d 940].) As we recently held, however, a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352. (*People v. Riel* (2000) 22 Cal.4th 1153, 1187-1188 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1053 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Box, supra*, 23 Cal.4th at p. 1200.) Our independent review of the record in the present case shows that the court was well aware of its responsibilities under Evidence Code section 352. The court held an extensive hearing outside the jury's presence to determine whether to admit the photographs, and ultimately excluded several of them as potentially prejudicial to the defendants. Similarly, when the prosecutor offered into evidence the videotape of the crime scene, the court privately viewed the tape and suggested editing changes to excise those portions showing a close-up view of Ryoko's face and body, again to minimize possible prejudice to the defendants. Although the court's final orders regarding the photographs and videotape did not expressly mention the weighing process required by Evidence Code section 352, the record as a whole shows clearly the court undertook that process in reaching its ultimate decision.

As for defendant's argument that admission of the photographs prejudiced the jury's *penalty* decision, our conclusion that the court properly exercised its discretion in admitting them at the guilt phase applies as well to defendant's penalty phase contention. (See *People v. Box, supra*, 23 Cal.4th at pp. 1200-1201.)

### 3. *Denial of Motion for New Penalty Phase Jury*

Defendant next argues the court improperly denied his motion to impanel a new jury to decide the penalty issue, under section 190.4, subdivision (c). He speculates that the prosecutorial misconduct and inflammatory photographs previously discussed may have caused the guilt phase jury to

become biased against him, and that a new jury was needed to assure him a fair penalty trial. Defendant also observes that, following the guilt phase, the court relieved his first defense team (Attorneys Pohlson and Hall) of their appointment due to a conflict arising from an apparent plot by defendant to escape by forcing those attorneys to secure weapons for him and then killing them. New counsel (Attorneys Horan and Ospino) sought a new jury for the penalty phase asserting, among other grounds, the substantial delay in proceeding to the penalty phase, and new counsel's nonparticipation in voir dire of the existing jury. The court denied the motion without comment.

Section 190.4, subdivision (c), provides the same jury shall try both the guilt and penalty phases "unless for good cause shown" the court discharges the jury and impanels a new one. In light of this "legislative preference" for a single jury, we have indicated that good cause to impanel a new jury must appear on the record as a demonstrable reality and show the jury's inability to perform its function. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1354 [65 Cal.Rptr.2d 145, 939 P.2d 259]; see *People v. Bemore* (2000) 22 Cal.4th 809, 858 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) On appeal, we will overturn the court's ruling denying a new jury only if we find the court abused its discretion in doing so. (*Ibid.*) Although defendant urges us to review the record "independently" on this point, he cites no cases holding that such an independent review of this kind of discretionary ruling under section 190.4, subdivision (c), is either necessary or appropriate.

We find no abuse of discretion. As we have seen (pts. 1 and 2, *ante*), contrary to defendant's assumption, the guilt phase jury was neither tainted nor prejudiced by prosecutorial misconduct, improper victim impact evidence, or inadmissible crime scene photographs. Moreover, trial counsel's desire to participate in jury voir dire was an insufficient ground for impaneling a new jury. (See *People v. Rowland* (1992) 4 Cal.4th 238, 267-269 [14 Cal.Rptr.2d 377, 841 P.2d 897].) And the delay in commencing the penalty phase, by itself, would be an insufficient ground for impaneling a new jury, as mere delay would not necessarily impair the jury's ability to perform its function in determining the appropriate penalty for defendant. Nothing in the record suggests defendant was actually prejudiced by the delay.

### 4. *Victim Impact Evidence*

■ Defendant next argues that the court's admission of improper and "fundamentally unfair" victim impact evidence at both the guilt and penalty phases denied him a fair trial. (See *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [111 S.Ct. 2597, 2608, 115 L.Ed.2d 720].) We discuss the penalty phase claim below (*post*, at p. 1171). With respect to the guilt phase, defendant

refers again to Dr. Parsons's testimony relating facts regarding Kazumi's injuries, the extent of his paralysis, and his loss of bodily functions. The Attorney General faults defendant for failing to object to the foregoing testimony by Dr. Parsons, but as defendant observes, his codefendants did so object, and at the beginning of trial the parties stipulated that an objection by one defendant would be deemed made by all three.

Nevertheless, defendant's guilt phase contention lacks merit. Kazumi himself repeated much of the subject matter of the challenged testimony during his own guilt phase testimony, and defendant concedes that Kazumi's testimony was properly admitted. All of this evidence was relevant to show the extent of Kazumi's injuries and to confirm that, despite his injuries, he could accurately recall the incident. The court did not err in permitting Dr. Parsons to review, and elaborate on, some of the same ground covered in Kazumi's unobjectionable testimony. Additionally, any error in this regard clearly would be harmless in light of the overwhelming evidence of defendant's guilt.

We conclude that each of defendant's various guilt phase contentions lacks merit. We observe that, asserting a denial of his due process, fair trial, and impartial jury rights, defendant has supported each of his guilt phase contentions with references to various provisions of the state and federal Constitutions, but the assertion of these provisions adds nothing of substance to his otherwise meritless claims.

B. *Penalty Phase*

1. *Victim Impact Evidence*

As noted, defendant contends the court erred in admitting "funda-mentally unfair" victim impact evidence during the penalty phase. This evidence, which defendant claims was unduly voluminous and inflamma-tory, fell into two categories: (1) the impact of Ryoko's death on Kazumi and Dean, and (2) the extent of the injuries, physical and psychological, that Kazumi alone suffered.

a. *Impact on Ryoko's family*

Kazumi and Dean each explained the various ways they were adversely affected by their loss of Ryoko's care and companionship. Victim impact evidence of this kind, directed toward showing the impact of the defendant's acts on the family of his victims, is admissible at the penalty phase of capital trials. (See *Payne v. Tennessee, supra,* 501 U.S. at pp. 826-827 [111 S.Ct. at

p. 2609]; *People v. Edwards* (1991) 54 Cal.3d 787, 832-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Our review of the record indicates the evidence was relevant and not so voluminous or inflammatory as to divert the jury's attention from its proper role or invite an irrational response. (See *People v. Sanders* (1995) 11 Cal.4th 475, 549-550 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Love* (1960) 53 Cal.2d 843, 854-857 [3 Cal.Rptr. 665, 350 P.2d 705] [unduly prejudicial victim impact evidence, including tape-recorded groans of dying victim].)

### b. *Kazumi's own injuries*

Defendant argues that evidence regarding Kazumi's injuries, including his paralysis, pain, and inability to care for himself, was not true "victim impact" evidence, as it failed to show the impact of Ryoko's death on Kazumi. This evidence did show, however, that because he suffered severe injuries at defendant's hand, Kazumi will require extensive care that Ryoko might have provided but for her murder, an aggravating circumstance of which the jury was entitled to learn.

Moreover, evidence of Kazumi's injuries was relevant at the penalty phase to show the circumstances of defendant's crimes and the nature and extent of his violent acts other than Ryoko's murder (see § 190.3, factors (a), (b)). As we have stated, "Evidence of the impact of the defendant's conduct on victims other than the murder victim is relevant if related directly to the circumstances of the capital offense. [Citations.]" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1063 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) Obviously, Kazumi's injuries fall squarely within that category. Contrary to defendant, we find nothing in *Payne v. Tennessee, supra,* 501 U.S. 808, or other high court decisions, that is contrary to this analysis.

### 2. *Ken Christian's Testimony*

█ Defendant next argues that the court erred in admitting penalty phase testimony from Ken Christian to the effect that in 1985, three years before the Hanano crimes, defendant initiated a plan to commit another robbery and murder in order to obtain a black Corvette from its owner. The court allowed the evidence to rebut defendant's own penalty phase testimony that (1) the Hanano robbery murder was not part of any preexisting plan to steal a black Corvette, and (2) in 1985 Christian approached *him* with the plan to steal such a car and kill the owner.

Defendant contends that Christian's testimony was inadmissible because it described *proposed* criminal activity rather than "a completed crime" that

might have been admissible under section 190.3, factor (b). In defendant's view, the testimony was likewise inadmissible "past conduct" character evidence under Evidence Code section 1101. He claims that it should have been excluded as remote, the conversation having taken place three years before the Hanano crimes occurred. Finally, defendant believes the testimony was unduly prejudicial because it "undermined the defense case in mitigation." (See Evid. Code, § 352.)

We think the foregoing evidence was admissible to show that, contrary to defendant's own testimony on cross-examination, he originated an earlier plan to steal a black Corvette and murder its owner. The testimony was proper to rebut defendant's attempt to disclaim any preexisting intent to accomplish such crimes. In light of its relevance for this purpose, the trial court did not abuse its discretion in admitting the evidence. Because the evidence retained some probative value, any remoteness of Christian's testimony would affect its weight, not its admissibility. (See *People v. Thomas* (1978) 20 Cal.3d 457, 466 [143 Cal.Rptr. 215, 573 P.2d 433].) Defendant cites no case suggesting that the court had a duty to give sua sponte instructions limiting consideration of the foregoing evidence to contradicting defendant's testimony.

### 3. *Denial of Severance or Separate Jury*

■ Defendant contends the court erred in failing to hold separate penalty trials, or convene separate juries, to decide the appropriate penalty for him and codefendant DeWitt. Defendant suggests that he was necessarily disadvantaged by the jury's probable comparison of the two codefendants. Defendant notes that he is "a bi-racial Caucasian and African-American male" from the Bronx, and DeWitt is entirely Caucasian from Southern California, where trial was held. According to defendant, his prior criminal record was more "significant," and his mitigating evidence less impressive, than DeWitt's. Indeed, the jury rendered a verdict of life imprisonment without parole for DeWitt, while selecting death for defendant.

Defendant relies on cases strongly suggesting the need for individualized sentencing in capital cases. (See, e.g., *Lockett v. Ohio* (1978) 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973]; *People v. Belmontes* (1988) 45 Cal.3d 744, 811 [248 Cal.Rptr. 126, 755 P.2d 310].) He observes that we have upheld the use of separate juries for jointly tried defendants, as an alternative to outright severance. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287 [18 Cal.Rptr.2d 796, 850 P.2d 1]; see § 190.4, subd. (c) [for "good cause" court may discharge penalty jury and convene new jury].) *Cummings* explained, however, that the decision to use dual juries is largely

a discretionary one, and that "[w]hen the trial court's denial of severance and impanelment of dual juries is urged as error on appeal . . . the error is not a basis for reversal of the judgment in the absence of identifiable prejudice or 'gross unfairness . . . such as to deprive the defendant of a fair trial or due process of law.' [Citations.]" (*People v. Cummings, supra,* 4 Cal.4th at p. 1287; see also *Lockhart v. McCree* (1986) 476 U.S. 162, 180 [106 S.Ct. 1758, 1768-1769, 90 L.Ed.2d 137] [upholding use of single jury to try both guilt and penalty phases of single defendant's trial]; *People v. Thornton* (1974) 11 Cal.3d 738, 753 [114 Cal.Rptr. 467, 523 P.2d 267] [same]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1241 [255 Cal.Rptr. 569, 767 P.2d 1047] [no good cause shown for separate penalty juries at joint trial].)

We recently considered the very issue defendant raises regarding the need for severance or separate juries for multiple defendants. In *People v. Ervin* (2000) 22 Cal.4th 48, 69 [91 Cal.Rptr.2d 623, 990 P.2d 506], we observed, "We have held that, in light of the statutory preference for joint trials (see § 1098), severance remains largely within the trial court's discretion. [Citations.] Nonetheless, we have also stated that a reviewing court may reverse a conviction when, because of consolidation, ' "gross unfairness" ' has deprived the defendant of a fair trial. [Citation.] The record in the present case, however, fails to show that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant or were confused by the limiting instructions." In *Ervin,* we rejected the defendant's claim that the court should have ordered separate guilt and penalty trials for each defendant. (*Ibid.* [guilt phase]; *id.* at pp. 95-96 [penalty phase].)

In the present case, we find nothing in the record indicating defendant's jurors failed to assess independently the appropriateness of the death penalty for defendant or DeWitt, or engaged in improper comparative evaluations of these men. The penalty phase jury was instructed to consider the evidence separately as to each defendant, and not consider as evidence against one defendant any evidence admitted only against another. Moreover, the jury was told to "decide separately the question of the penalty as to each of the defendants," the same instruction given in the *Ervin* case. (*People v. Ervin, supra,* 22 Cal.4th at p. 95.) These instructions were adequate to ensure individual consideration of penalty as to each defendant. In the absence of a showing that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant, we can find no abuse of discretion in failing to sever the trial or order separate penalty phase juries.

### 4. *Ruling on Motion to Modify Verdict*

Defendant next claims the trial court denied his motion to modify the verdict (see § 190.4, subd. (e)) after hearing and considering some victim

impact evidence that had not been presented to the jury. The record shows that the court presided over codefendant Scheid's sentencing hearing two weeks before ruling on defendant's modification motion. At the Scheid hearing, members of the Hanano family, including children June and Russell (who had not testified at defendant's trial), expressed their strong desire that all defendants receive maximum sentences. Additionally, at this hearing, the court considered Scheid's probation report, which likewise contained statements by the Hanano children not presented to defendant's jury. For example, as defendant observes, Kazumi stated at one point that he was ruining his sons' lives and that he would be better off dead.

At defendant's own sentencing hearing, and *before* receiving testimony from the Hanano family, the court announced that it had denied the automatic motion to modify the sentence. This procedure was proper under our case law. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1023 [30 Cal.Rptr.2d 818, 874 P.2d 248], and cases cited.) But defendant maintains the court's decision to deny modification was necessarily influenced by the victim impact evidence it previously heard at the earlier Scheid hearing.

A trial judge is inevitably exposed to a plethora of inadmissible, even highly inflammatory, evidence during the course of trial. Yet, in the absence of contrary evidence, we may presume that such exposure played no role in the court's ultimate decisions. (E.g., *People v. Champion* (1995) 9 Cal.4th 879, 951 [39 Cal.Rptr.2d 547, 891 P.2d 93], and cases cited; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 414, pp. 464-465, and cases cited.) This presumption would be especially valid when, as here, the evidence at issue was relevant to, and properly received in the course of, sentencing *another* codefendant.

We presume the trial court's training and experience enabled it to confine its consideration of such evidence to the case in which it was properly admitted. Defendant cites nothing in the record indicating the court actually relied on any inadmissible evidence in making its decision to deny modification. (See *People v. Memro* (1995) 11 Cal.4th 786, 886 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Lewis* (1990) 50 Cal.3d 262, 286-287 [266 Cal.Rptr. 834, 786 P.2d 892].) The court's statement cited only facts and circumstances properly elicited at defendant's trial. We conclude that defendant has failed to show the court relied on inadmissible evidence in denying his modification motion.

5. *Antisympathy Instructions*

Defendant's jury, during its penalty deliberations, had asked to see the court's guilt phase instructions on aiding and abetting. Recognizing that

these instructions were irrelevant to the penalty issue, the court nonetheless provided the jury with the entire set of guilt phase instructions, with the admonition that the aiding and abetting issues pertained to the guilt phase of trial, and that the jury should be guided by the penalty phase instructions in making its penalty decision.

Defendant now contends the court erred in providing the penalty phase jury with a copy of the guilt phase instructions, which included an instruction (see CALJIC No. 1.00) cautioning the jury not to be influenced by such emotions as passion, sympathy, and "pity for or prejudice against a defendant." Defendant also suggests the jury's request indicated its confusion regarding its responsibilities (see *McDowell v. Calderon* (9th Cir. 1997) 130 F.3d 833, 836-837), but we think the court's admonition was adequate to clarify the matter. Other than the jury's request itself, the record contains no indication the jurors were confused or uncertain regarding their sentencing responsibilities.

As for the "antisympathy" instruction in the guilt phase instructions, the penalty phase instructions specifically told jurors, pursuant to CALJIC No. 8.85, that they could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death . . . . *You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.*" (Italics added.) As noted, the court's subsequent response to the jury's request repeated the admonition that the guilt phase instructions should not be used in determining the appropriate penalty. We have consistently rejected similar claims of error. (See *People v. Frye* (1998) 18 Cal.4th 894, 1024-1026 [77 Cal.Rptr.2d 25, 959 P.2d 183], and cases cited.)

6. *Delay in Executing Sentence*

 Defendant next contends that his nine-year confinement on death row pending resolution of this appeal, and the probable additional delay in executing him, constitute cruel and unusual punishment under the state and federal Constitutions. We have rejected similar claims in recent cases, and defendant offers no compelling reasons for reconsidering them. A relatively lengthy period of incarceration pending appeal and execution is necessary to provide careful appellate review. (See *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29]; *People v. Frye, supra,* 18 Cal.4th at pp. 1030-1031.) Moreover, as we have frequently held, matters bearing on the legality of the execution of sentence, rather than the validity of the sentence itself, are no basis for reversal of the judgment. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2];

*People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1058-1059 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1110 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

### 7. *Method of Execution*

Defendant asserts the method of executing the death penalty is cruel and unusual punishment under both the state and federal Constitutions. We have rejected similar claims in recent cases, and defendant offers no compelling reasons for reconsidering them. As previously noted, asserted imperfection in the method of execution is no basis for reversal of the judgment. (See, e.g., *People v. Samayoa, supra,* 15 Cal.4th at p. 864.)

### 8. *Disproportionate Penalty*

Defendant next asserts that death is a disproportionate penalty for him in light of his crime and his background. (See *People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697].) He observes that his prior offenses were each nonviolent in nature, his childhood was troubled and abusive, and he committed his murder while intoxicated by cocaine, possibly resulting in a "panic" shooting. Defendant asks us to exercise our supposed statutory authority (see §§ 1181, subd. (7), 1260; *People v. Hines* (1997) 15 Cal.4th 997, 1081 [64 Cal.Rptr.2d 594, 938 P.2d 388] (conc. opn. of Mosk, J.)) to reduce his death judgment to life imprisonment without parole.

The majority in *Hines* observed that we will set aside a death judgment if the penalty seems " 'grossly disproportionate to the defendant's individual culpability.' " (*People v. Hines, supra,* 15 Cal.4th at p. 1078.) Our review of the present record, including the various mitigating factors defendant cites, fails to convince us that death is a grossly disproportionate penalty for defendant's brutal execution-style murder and attempted murder in this case.

### 9. *Sentencing Instructions*

Defendant next asserts that the standard penalty phase sentencing instructions are inadequate in three respects. They fail to explain "which party bore the burden of proof on mitigation and aggravation, and what the burden was." They fail to require jury unanimity in determining which factors are aggravating. And they fail to instruct on "the presumption of life," to assure the jury will vote for life imprisonment without parole unless it finds beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating ones. None of these arguments has merit.

### a. *Burden of proof*

As the Attorney General observes, the jury was instructed that the prosecution must prove defendant's other crimes or prior felony convictions beyond a reasonable doubt, and that to return a death verdict, each juror must be persuaded "that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We have repeatedly rejected the argument that the federal or state Constitution, or Evidence Code sections 115 and 500, require further instructions on the subject of the burden of proof at the penalty phase. (See *People v. Welch, supra*, 20 Cal.4th at pp. 767-768; *People v. Holt, supra*, 15 Cal.4th at pp. 682-684.)

### b. *Unanimity*

The jury was instructed that unanimity regarding aggravating circumstances, including victim impact evidence, was not required. These instructions comport with our cases, which uniformly refuse to require jury unanimity as to specific aggravating circumstances. (E.g., *People v. Hines, supra*, 15 Cal.4th at p. 1077; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Defendant offers us no compelling reason for reconsidering these cases.

### c. *Presumption of life*

As the Attorney General observes, we have repeatedly rejected the argument that the penalty jury must be instructed that a presumption exists favoring life imprisonment. (E.g., *People v. Carpenter, supra*, 21 Cal.4th at p. 1064; *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Again, defendant offers us no compelling reason for reconsidering these cases.

### 10. *Other Penalty Phase Errors*

Defendant cites several supposed errors committed during the penalty phase. We find no error.

### a. *Factor (a)*

Defendant complains that permitting his jury to consider "the circumstances of the crime" he committed, as well as "any special circumstances found to be true," without further limiting instructions (see § 190.3, factor (a)), was improper and failed to provide "an objective standard to channel

the discretion of the jury . . . ." We have repeatedly upheld the instruction against similar challenges. (E.g., *People v. Osband* (1996) 13 Cal.4th 622, 703 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Sanders, supra*, 11 Cal.4th at p. 564.)

### b. *Factor (b)*

The jury was told to weigh the presence or absence of defendant's criminal activity involving the use or attempted use or threat to use force or violence. Defendant claims that the trial court failed to guide the jury properly concerning its consideration of evidence of his prior unadjudicated criminal activity. (See § 190.3, factor (b).) We have rejected similar arguments on several occasions. (E.g., *People v. Welch, supra*, 20 Cal.4th at p. 772; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

### c. *Factors (d), (g), and (h)*

Defendant asserts that section 190.3, factors (d) (defendant's "extreme" mental or emotional disturbance) and (g) (defendant acting under "extreme" duress or "substantial" domination of another), are unduly vague and overbroad. We have repeatedly upheld these provisions and the instructions based on them. (E.g., *People v. Welch, supra*, 20 Cal.4th at pp. 768-769; *People v. Ochoa, supra*, 19 Cal.4th at p. 479; *People v. Holt, supra*, 15 Cal.4th at p. 699.)

Defendant also challenges the instruction based on section 190.3, factor (h), which requires the jury to consider whether *at the time of the offense* the defendant's capacity to appreciate the criminality of his acts or conform to law was impaired by mental disease or intoxication. In defendant's view, the jury could have read the instruction as excluding consideration of such evidence as mitigating if it did not influence the commission of the crime. We recently rejected a similar argument regarding section 190.3, factor (d). (*People v. Riel, supra*, 22 Cal.4th at p. 1225.) As *Riel* observed, under the so called catchall instruction following section 190.3, factor (k) ("'any other circumstance which extenuates the gravity of the crime . . . *whether or not related to the offense for which he's on trial'*"), the defendant is entitled to present a full range of mitigating evidence, whether or not it related to the crime. (*People v. Riel, supra*, 22 Cal.4th at p. 1225, italics added by *Riel*; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 420-421 [63 Cal.Rptr.2d 1, 935 P.2d 708].) The court gave a similar instruction here.

### d. *Failure to delete inapplicable factors*

Defendant next contends the court erred in failing to delete from the penalty instructions any inapplicable sentencing factors. We have rejected

similar arguments on several occasions. (E.g., *People v. Carpenter, supra,* 21 Cal.4th at p. 1064; *People v. Frye, supra,* 18 Cal.4th at p. 1027.)

e. *Failure to designate aggravating and mitigating factors*

Defendant contends the court improperly failed to designate which sentencing factors are aggravating and which are mitigating. We have rejected similar arguments on several occasions. (E.g., *People v. Carpenter, supra,* 15 Cal.4th at p. 420; *People v. Frye, supra,* 18 Cal.4th at pp. 1026-1027.)

f. *Failure to limit aggravating evidence*

Defendant complains the trial court failed to give an instruction limiting the use of "nonstatutory" aggravating evidence. (See *People v. Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782].) The point lacks merit. The court gave the standard sentencing instruction (see CALJIC No. 8.85), and we have held that instruction is proper despite its failure expressly to limit aggravating evidence to the enumerated statutory factors, and to exclude nonstatutory factors as a basis for the death penalty. (See, e.g., *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

g. *Mitigating factors instruction*

The court gave an instruction (CALJIC No. 8.88) defining a mitigating circumstance as one that may not constitute a justification for the crime, but may be considered as an extenuating circumstance in determining the appropriate penalty. Defendant, armed with "empirical evidence" gleaned from studies not presented to the trial court, contends this instruction was insufficient and likely was understood as limiting the kinds of mitigating evidence the jury could consider. We have rejected similar arguments in recent cases. (See *People v. Welch, supra,* 20 Cal.4th at pp. 772-773; *People v. Marshall* (1990) 50 Cal.3d 907, 936-937 [269 Cal.Rptr. 269, 790 P.2d 676].)

In a related argument, defendant contends the court failed affirmatively to instruct the jury to consider "all sympathetic mitigating factors, mercy and non-statutory mitigation," failed to instruct on the role sympathy for defendant and his family should play, and failed to instruct that the guilt phase anti-sympathy instruction was inapplicable during the penalty phase. These arguments lack merit. The jury was told it could consider "any sympathetic or other aspect of the defendant's character or record" and was also told to disregard guilt phase instructions in conflict with that principle. Under our case law, these instructions were sufficient. (See *People v. Champion, supra,*

9 Cal.4th at p. 943; *People v. Nicolaus* (1991) 54 Cal.3d 551, 588 [286 Cal.Rptr. 628, 817 P.2d 893]; *People v. McLain* (1988) 46 Cal.3d 97, 118 [249 Cal.Rptr. 630, 757 P.2d 569].)

h. *Failure to instruct on returning life imprisonment verdict*

Defendant faults the sentencing instructions (CALJIC No. 8.88) for failing to direct the jury to impose a life imprisonment without parole sentence if it concluded the mitigating circumstances outweighed the aggravating ones. We have repeatedly rejected the claim in light of other language in this instruction, allowing a death verdict only if aggravating circumstances outweighed mitigating ones. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1243 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].)

Defendant also faults CALJIC No. 8.88 for calling on the jury to impose death if they find "substantial" aggravating factors, implicitly compelling a death verdict if aggravating circumstances outweighed mitigating ones. Defendant observes that under our case law, the jury may reject a death sentence even if mitigating circumstances do not outweigh aggravating ones. (*People v. Brown* (1988) 46 Cal.3d 432, 450-454 [250 Cal.Rptr. 604, 758 P.2d 1135].) Our reading of the instruction discloses no compulsion on the jury to impose death under such circumstances. Instead, the instruction simply explains that no death verdict is appropriate unless substantial aggravating circumstances exist which outweigh the mitigating ones. This instruction was proper under our case law. (*People v. Medina, supra*, 11 Cal.App.4th at pp. 781-782; *People v. McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Defendant also argues CALJIC No. 8.88 was deficient for failing expressly to inform the jurors they could vote against the death penalty even if they believed the aggravating circumstances outweighed the mitigating ones. We have rejected the argument in past cases. (*People v. Arias, supra*, 13 Cal.4th at pp. 170-171; *People v. Medina, supra*, 11 Cal.4th at p. 782.)

i. *Inadequate notice of penalty phase evidence*

█ Defendant next contends the prosecution gave him inadequate notice it intended to rely on victim impact evidence at the penalty phase. (See § 190.3.) According to defendant, the prosecutor announced his intent to submit such evidence only one day before the penalty phase commenced.

The record shows that, in December 1989, the prosecutor timely notified defendant that he intended to introduce penalty phase evidence of the facts

and circumstances of the crime. At this time, the cases proscribed admitting victim impact evidence at the penalty phase, and therefore the prosecutor's failure to include such evidence in his original notice was understandable. (See *South Carolina v. Gathers* (1989) 490 U.S. 805 [109 S.Ct. 2207, 104 L.Ed.2d 876]; cf. *People v. Gordon* (1990) 50 Cal.3d 1223, 1266-1267 [270 Cal.Rptr. 451, 792 P.2d 251].) However, by November 5, 1991, when the prosecutor notified defendant of his intent to use victim impact evidence, it had become clear that no constitutional impediment existed to the admission of victim impact evidence at the penalty phase. On June 27, 1991, the high court had decided *Payne v. Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720], so holding. Yet the prosecutor waited more than four months to notify defendant of his intent to use such evidence.

The People observe that general notice of the intended evidence will suffice, and that the failure to specify the precise evidence to be presented does not render the notice constitutionally insufficient. (See *People v. Hart* (1999) 20 Cal.4th 546, 638-639 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Carpenter, supra*, 15 Cal.4th at p. 421; *People v. Clark* (1993) 5 Cal.4th 950, 1033 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) Yet when, on November 5, the prosecutor informed defendant he intended to use victim impact evidence, we had not yet ruled that such evidence properly could be admitted at the penalty phase as evidence of the facts and circumstances of the crime. (See *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436], decided Nov. 25, 1991.) Therefore, we cannot charge defendant with knowing, prior to November 5, that the prosecutor's notice of evidence of the "circumstances" of the crime was intended to include victim impact evidence.

Nonetheless, we find any error in the timing of the prosecutor's notice to be harmless to the defense. The purpose of the notice provision is to afford defendant an opportunity to meet the prosecutor's aggravating evidence. (*People v. Carrera* (1989) 49 Cal.3d 291, 334 [261 Cal.Rptr. 348, 777 P.2d 121].) Here, the trial court was careful to limit the victim impact evidence to testimony by Kazumi and Dean Hanano, much of which was already elicited during the guilt phase. Although defendant now claims that "Counsel were not given sufficient notice to allow them to effectively meet this evidence," he fails to explain what more he could have done. The record shows that defendant, when notified of the prosecutor's intent to offer victim impact evidence, neither objected, requested a continuance, nor otherwise indicated the delay in receiving notice had prejudiced the defense. These omissions demonstrate a clear lack of prejudice to the defense. (See *People v. Cooper* (1991) 53 Cal.3d 771, 842 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Carrera, supra*, 49 Cal.3d at p. 334.)

### j. *Failure to require written jury findings*

Defendant contends the court erred in failing to require the jury to give a written statement and findings justifying its death verdict. In defendant's view, such findings are needed to assure effective appellate review, to guarantee defendant is treated equally with noncapital felony defendants, and to assure the jury appreciates the gravity of its sentencing task. Our cases disagree. (See *People v. Welch, supra,* 20 Cal.4th at p. 772; *People v. Frye, supra,* 18 Cal.4th at p. 1029; *People v. Diaz* (1992) 3 Cal.4th 495, 571 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Frierson* (1979) 25 Cal.3d 142, 179 [158 Cal.Rptr. 281, 599 P.2d 587].)

### k. *Failure to instruct on life imprisonment without parole*

Defendant next complains of the court's failure to instruct on the "true meaning" of a life imprisonment without parole sentence. Once again, as defendant acknowledges, we have repeatedly rejected similar arguments, and we see no compelling reason to reconsider them here. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1271 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Arias, supra,* 13 Cal.4th at pp. 172-173.)

### l. *Multiple use and counting of aggravating circumstances*

Defendant claims that multiple use and counting of various facts as aggravating circumstances "artificially inflated the statutory factors favoring death." We find no improper multiple use or counting. Defendant points to the dual felony counts of robbery and burglary, observing that they served as two theories for felony murder and the felony-murder special circumstances, rendering him "doubly eligible for the death penalty." These felonies were also used as "circumstances of the crime" charged under section 190.3, factor (a).

Our cases allow use of a felony to qualify a defendant both for first degree murder and for a special circumstance justifying the death penalty. (See *People v. Ochoa, supra,* 19 Cal.4th at p. 479; *People v. Memro, supra,* 11 Cal.4th at pp. 886-887; *People v. Marshall, supra,* 50 Cal.3d at pp. 945-946.) The Attorney General observes that defendant failed to request an instruction limiting dual consideration of such crimes both as special circumstances and as circumstances of the crime under section 190.3. (See *People v. Welch, supra,* 20 Cal.4th at p. 769; *People v. Ashmus* (1991) 54 Cal.3d 932, 997 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

m. *Effect of three strikes law*

Defendant argues that the enactment of the three strikes law (see § 667, subds. (c), (f)(1)) precludes imposition of the death penalty. Our recent case law rejects the argument. (*People v. Carpenter, supra,* 21 Cal.4th at p. 1064.)

11. *Intercase Proportionality Review*

Defendant asserts the trial court improperly failed to provide for intercase proportionality review. The argument lacks merit. (*People v. Riel, supra,* 22 Cal.4th at pp. 1223-1224; *People v. Carpenter, supra,* 21 Cal.4th at p. 1064; *People v. Bradford, supra,* 15 Cal.4th at p. 1384.)

12. *Cumulative Errors*

Defendant asserts the combined effect of the various "serious constitutional errors" in this case requires reversal. As we have seen, we conclude no such errors were committed here. Accordingly, we need not address defendant's contention that the supposed errors combined to prejudice his case.

We conclude that each of defendant's various penalty phase contentions lacks merit. We observe that, as with his guilt phase arguments, defendant has supported each of his contentions with references to various provisions of the state and federal Constitutions, but the assertion of these constitutional provisions adds nothing of substance to his otherwise meritless claims.

## III. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Mallano, J.,* concurred.

Appellant's petition for a rehearing was denied January 29, 2002.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.